No. 47,833

STATE OF KANSAS, *Appellant and Cross-Appellee*, v. CHARLES C. CAMPBELL, RICHARD MALLOY, et al., *Appellees and Cross-Appellants*.

(539 P. 2d 329)

Opinion filed July 17, 1975.

*Mark L. Bennett, Jr.*, special assistant district attorney, argued the cause, and *Curt T. Schneider*, attorney general, and *Gene M. Olander*, district attorney, were with him on the briefs for the appellant and cross-appellee.

*John E. Shamberg*, of Schnider, Shamberg and May, Chartered, of Kansas City, and *Charles S. Fisher, Jr.*, of Fisher, Ralston and Ochs, of Topeka, argued the cause, and *Robert D. Ochs*, of the same firm was with them on the briefs for appellee and cross-appellant Docking.

*Heywood H. Davis*, of Kansas City, Mo., argued the cause, and *Clarence H. Dicus*, of Kansas City, Mo., and *Donald Patterson*, of Topeka, were with him on the briefs for appellees and cross-appellants Campbell, Korff, Lakey, Norton, Jarvis, Sledd, Towner, and Marshall & Brown of Kansas.

*Larry E. Benson*, of Weeks, Thomas, Lysaught, Bingham and Mustain, Chartered, of Kansas City, argued the cause, and *Robert H. Bingham* of the

same firm was with him on the briefs for appellees and cross-appellants Norbert Sidorowicz and Marshall & Brown-Sidorowicz.

*Thomas E. Joyce,* of Kansas City, argued the cause, and *Benjamin E. Franklin* and *Joseph T. Carey,* both of Kansas City, were with him on the briefs for appellees and cross-appellants Will C. Taliaferro, Bruce Browne, and Taliaferro and Browne, P. A.

*Sam A. Crow,* of Topeka, argued the cause and was on the briefs for appellees and cross-appellants Burgess, Latimer & Miller, P. C., William E. Burgess, William A. Latimer, Robert D. Miller, Ralph E. Preston, Elton R. Plaster, Robert Sommers, et al.

*Robert E. Tilton,* of Topeka, argued the cause and was on the briefs for appellee and cross-appellant Richard Malloy.

The opinion of the court was delivered by

HARMAN, C.: These are two criminal actions wherein by grand jury indictments certain individuals and corporations were charged with conspiracy to commit bribery and another individual was charged with bribery. The state has appealed from rulings dismissing both indictments because the grand jury was improperly selected and defendants have cross-appealed from the denial of other pretrial motions filed by them. The appeals in the two cases have been consolidated for the purpose of the state's appeal under the parties' stipulation that as to common questions a decision in one case will determine the decision in the other.

On November 20, 1973, the then Kansas attorney general applied to Shawnee county district court judges *en banc* for the impaneling of a grand jury to investigate the awarding of architectural contracts for certain work at the University of Kansas Medical Center at Kansas City, Kansas. The application was granted and a grand jury was ordered summoned. After selection of the grand jury and presentation of evidence it returned two indictments on January 22, 1974. In district court case No. 29,155 the indictment charged eighteen individuals and five corporations with conspiring to bribe Richard Malloy, a public employee. These defendants are: Charles C. Campbell; George R. Docking; Edwin W. Korff; Jack E. Lakey; M. Gene Norton; Robert B. Jarvis; Donald R. Sledd; Forrest A. Towner; Marshall and Brown of Kansas, Architects, Engineers, Planners, Chartered, a Kansas Corporation; Marshall & Brown, Inc., a Missouri corporation; Marshall & Brown-Sidorowicz, P. A., a Kansas corporation; Norbert J. Sidorowicz; Taliaferro & Browne, P. A., a Kansas corporation; Will Taliaferro; Bruce Browne; Burgess, Latimer & Miller, P. C., a

Missouri corporation; William E. Burgess; William A. Latimer; Robert D. Miller; Ralph E. Preston; Elton R. Plaster; Robert Sommers; and John Richner.

In district court case No. 29,156 the indictment charged Richard Malloy with bribery.

Shortly after the indictments were returned the defendants individually filed various motions alleging lack of venue and jurisdiction, that the conspiracy and bribery statutes are unconstitutional; the particular indictment was duplicitous, vague and failed to charge an offense; and also requesting discovery. These motions were ruled upon by Honorable E. Newton Vickers, administrative judge of Shawnee district court (defendants' cross-appeal is from those rulings adverse to them). Subsequently all defendants filed motions for dismissal of the indictments upon the ground the grand jury which returned them had been illegally selected. The Shawnee district court judges disqualified themselves for the purpose of determining these motions since they had promulgated the rule prescribing the method of jury selection in Shawnee county and were also acting as jury commissioners. Upon this recusal this court assigned Honorable Jay Sullivan, retired district judge, as judge *pro tem* to hear and determine the motions challenging the grand jury's composition. Judge Sullivan sustained the motions and dismissed the indictments.

Thereafter disagreement developed between the state and the defendants as to the exact import of Judge Sullivan's memorandum opinion dismissing the indictments, as a result of which some of the defendants filed motions to amend or clarify the judgments and for additional findings. These motions were designed to obtain a ruling that the grand jury was void *ab initio*. Prior to hearing on these motions the state filed affidavits of prejudice in an effort to disqualify Judge Sullivan from ruling upon them. This court assigned Honorable Leo A. McNalley, retired district judge, as judge *pro tem* to determine the sufficiency of the affidavits. Judge McNalley ruled that the affidavits were legally insufficient. Upon remand, Judge Sullivan heard and sustained the motions to amend, ruling that the grand jury was void *ab initio*. The state has appealed from these three adverse rulings: Judge Sullivan's order dismissing the indictments, Judge McNalley's ruling on the affidavits of prejudice and Judge Sullivan's final order. Defendants have cross-appealed from prior adverse rulings by Judge Vickers.

Several witnesses testified at a hearing held before Judge Sullivan

on the motion to dismiss the indictments because of improper grand jury selection. We summarize that evidence. After the enactment of the petit and grand jurors act of 1971 the judges of the district court of Shawnee county adopted local rule No. 21, which found that Shawnee county had appropriate base information programmed as a part of its computer operations containing names and addresses of all registered voters in the county, and that use of this list would comply with the spirit of the jury selection laws of Kansas, and said list would be used by the judges serving as jury commissioners in securing jurors, the names to be selected at random through the computer program. Prior to adopting this system of jury selection the Shawnee county judges had instructed Mr. Albert Hatch, data processing manager for Shawnee county, to devise a computer program for the selection of jurors from the voter registration rolls. Mr. Hatch checked as to how jurors' names were selected from voter registration records in Johnson county, Kansas, and in the federal courts in Washington, D. C. Using this experience he developed a formula which was accepted by the Shawnee district judges and used in selecting jurors' names by computer. The components of the formula were the number of names on the voter registration list, the number of jury lists to be selected, the number of individuals to be placed on each jury list, and, finally, a starting number between zero and one hundred which would be given to Mr. Hatch by a district judge. In practice ten separate jury lists were prepared with 175 names on each list. Under the formula the names on the voter registration list were assigned numbers and placed in the computer. The starting number selected by a judge would be the first juror selected and the starting point of the entire selection of the jury panel. Then the factor derived from the formula was applied. For example, if the factor was 43 then every forty-third person on the voter registration list, using the number selected by a judge as the starting point, would be selected, except the computer would skip over a number flagged because the individual represented by it had previously served as a juror within a particular time. Mr. Hatch's instructions from the judges were to select names for the jury list at random.

Mr. Hatch testified that in September, 1973, when the names were selected from which the grand jury was impaneled in the instant case there were 75,814 persons on the voter registration lists (later corrected to 83,145); at the same time there were about 50,000 more names on the census and enumeration rolls; that under

his definition of random there was not a true random selection of jurors by the method used; a true random selection is not possible by machine, random selection being defined as a system wherein each item within the group has the same chance of being selected as every other item.

Honorable Michael A. Barbara, judge of division No. 2 of the Shawnee district court, testified that in promulgating rule No. 21 the Shawnee judges interpreted K. S. A. 43-163 to provide that if a computer was used instead of a jury wheel, the base information could be an alternate source of names such as voter registration lists as long as the spirit of the law was followed; that voter registration lists were the source used in selecting jurors in federal courts; there was no intent to exclude anyone or any identifiable segment of people from jury service; it was the jury commissioners' desire to secure random selection and it was believed that was accomplished in using voter registration lists which were as current as any lists of persons which could be obtained; trouble was experienced under the old system using either enumeration or property tax rolls in obtaining names of persons who were currently residing at the addresses stated. Judge Barbara further testified that as a result of the challenge in this case to the jury selection method prescribed in rule No. 21, out of an abundance of caution and to avoid the possibility of further appellate litigation, Mr. Hatch had been directed to use the census list as well in compiling jury lists. Judge Vickers testified in similar vein, iterating it was thought the base information could be either the voter registration rolls or the census list. He stated it would have been unnecessary for the legislature to mention voter registration lists if alternative use was not intended since the census list necessarily includes those on the voter registration records.

Dr. Herman Lujan, associate professor of political science at Kansas University, testified that certain groups tended not to register to vote and that these groups normally included those from minority ethnic backgrounds, women, persons from lower income levels, those less educated, the very aged, and the eighteen to twenty-five age group. His conclusion, based on studies made in Kansas and elsewhere, was that a jury selection list based only on voter registration records tended to result in a disproportionate representation of the classes mentioned. Dr. Lujan in effect acknowledged that these classes were represented in substantial numbers on voter registration records albeit disproportionately.

Thomas Morrill, director of data processing for the Colorado judicial department, testified that the jury selection system used by Shawnee county did not provide a jury selected at random from a fair cross section of the community since certain persons were systematically excluded; in Colorado the base information for jury selection is city directories and automobile driver's license lists supplemented by voter registration rolls, which discriminates some against rural areas not having city directories; random selection can be made by not placing the names in the computer in alphabetical order.

John Oliver, instructor in mathematics and assistant director of the computer center at Washburn University, likewise testified that Shawnee county's jury selection system was not random. His definition of "random" meant that "any person on the list from which the jury is to be selected is equally likely to be selected." His objection was that the formula resulted in an arbitrary number and once that number is chosen as the starting point then the names thereafter selected automatically fall into place by reason of their numerical position on the entire list, to the exclusion of all others. He further testified a completely random system could be set up for Shawnee county's computer.

In his ruling sustaining the motions to dismiss the indictments Judge Sullivan made certain findings of fact in accord with the testimony just narrated. He further ruled that irrespective of lack of intent the selection of jurors under the Shawnee district court rule resulted in the exclusion from jury service of a substantial and identifiable group of citizens, namely approximately forty percent of the qualified electors of Shawnee county and therefore the defendants were denied their statutory right to have a jury array selected at random from a fair cross section of the community. Judge Sullivan also used language in his memorandum opinion indicating that defendants' constitutional rights may have been violated by the selection method used.

Two related issues are involved in the state's appeal from the order dismissing the indictments: Whether our statutory scheme of jury selection was violated in the method used here, and whether that method violated defendants' rights to trial by an impartial jury under the sixth and fourteenth amendments to the federal constitution and bill of rights Nos. 5, 10 and 18 to the Kansas constitution.

Note should first be made of pertinent provision of that which has been referred to as the petit and grand jurors act of 1971. K. S. A.

43-155 declares the public policy of this state is "that all litigants entitled to trial by jury shall have the right to juries selected at random from a fair cross section of the community in the district wherein the court convenes; and that all citizens shall have the opportunity to be considered for service on juries in the district courts of Kansas." K. S. A. 43-156 provides that no person shall be excluded from service as a grand or petit juror in the district courts of Kansas on account of race, color, religion, sex, national origin or economic status; further that every juror, grand and petit, shall be a citizen of the state, resident of the county and possess the qualifications of an elector.

The manner of preparation of jury lists is provided in K. S. A. 43-162 as follows:

"From and after January 1, 1972, all jury lists shall be prepared in accordance with the provisions of this act. Jury commissioners shall cause to be prepared under their supervision a list of persons qualified as jurors in each county. *Jury lists shall be prepared from voter registration records and enumeration or census records of the county in accordance with the intent and purposes of this act.* The jury list of each county shall be prepared and ready for use on January 1, 1972, and annually thereafter the commissioners shall cause the jury list of each county to be revised and updated by adding names of qualified jurors and removing names of those who have died, removed from the county, or who have otherwise become disqualified. For the purposes of preparation and revision of jury lists, commissioners shall have access to the voter registration and enumeration or census records of each county." (Emphasis supplied.)

K. S. A. 43-163 details the manner of affixing names to cards for mixing in the jury wheel prior to selection and then provides the following alternative to the use of the jury wheel:

". . . In the event that a county has appropriate base information programmed as a part of its computer operations so that it might comply with the spirit of the jury selection laws of Kansas the jury commissioners may by local rule provide alternate methods for securing jury panels directly from the computer without the necessity of drawing names or cards from a wheel manually."

The state contends the legislature obviously intended that voter registration records might be used as an alternative method of selecting jurors or it would not have mentioned them; that random selection was in fact made within "the spirit of the law" but in any event the statutory language is directory in nature and absent fraud or corruption in the method of selection used challenge will not lie for any irregularity; no purposeful discrimination was shown by the jury commissioners in choosing the method of jury selection

and none existed; no identifiable class of persons entitled to consideration was excluded nor is there any requirement for proportionate representation of any group on a jury list; and there was no showing of prejudice to any defendant.

Defendants counter that both statutory and constitutional rights were violated by the method of jury selection used; the provisions of K. S. A. 43-162 are mandatory and not directory; the jury selection was not made "at random", as found by the trial court under the evidence; and defendants were prejudiced by the method used in that identifiable classes of persons were excluded.

The Shawnee district judges in their capacity as jury commissioners promulgated rule No. 21 which provided for the use of a computer in the selection of jury panels from the list of registered voters in the county. The base information programmed into the computer consisted solely of this list which concededly is not in strict accord with the language of K. S. A. 43-162 stating that ". . . Jury lists shall be prepared from voter registration records and enumeration or census records of the county. . . ." But is such preparation "in accordance with the intent and purposes of this act" as further stated in that statute, does a list of registered voters in the county constitute appropriate base information in compliance with "the spirit of the jury selection laws of Kansas" (43-163) and does the method of selection result in a jury "selected at random from a fair cross section of the community in the district wherein the court convenes" (43-155)?

In construing our statutes on jury selection prior to passage of our present enactment this court held that they were directory in nature and not mandatory, and absent corruption, serious misconduct or palpable disregard of the law, a defendant may not successfully challenge the jury panel for mere irregularities in its selection process (*State v. Stanphill*, 206 Kan. 612, 481 P. 2d 998). In *State v. Carter*, 133 Kan. 718, 3 P. 2d 487, the then applicable statute prescribing duties of those compiling jury lists used the mandatory term "shall". Notwithstanding such use this court held with respect to alleged irregularity in the method of selection:

"The statute, however, is directory, and a defendant may not cause the panel to be quashed on any ground which does not involve corruption, serious misconduct, or palpable disregard of law. Informalities and irregularities are not enough." (p. 719.)

See also *State v. Theus*, 207 Kan. 571, 485 P. 2d 1327.

These rules are in accord with those followed elsewhere, expressed in 50 C. J. S., Juries, § 163b. as follows:

"Statutory provisions with regard to making up the jury list ordinarily are held to be merely directory, and errors and irregularities in failing strictly to comply with the provisions which are not prejudicial to the parties do not invalidate the list or furnish any ground for challenging the array. . . ." (p. 889.)

Defendants cite and rely on *State v. Jenkins,* 32 Kan. 477, 4 Pac. 809, wherein a palpable disregard of the law as to jury selection was found which resulted in the panel being quashed. The names of the jurors placed on the list were taken from the assessment rolls for the year 1883, when they should have been taken from those of the year 1882. The court held the law had been palpably disregarded and a challenge to the array should have been sustained. This court stated:

"The legislature in this state has said that certain persons shall be selected as jurors; the officers required to make the list in this case have said other persons shall be returned as jurors. Therefore there was a substantial departure from the statutory mode in making the list of persons to serve as jurors for 1883. This disregard for the statute cannot be allowed. The requirements of the statute as to the making of a list of persons to serve as jurors, and the selection of the panel therefrom, are in the nature of a privilege to the accused, and he has the right to insist that there shall be a substantial compliance with the law." (p. 479.)

In cases decided subsequent to *Jenkins* distinction between mere irregularity and palpable disregard of the law has been repeatedly made (see cases cited 3 Hatcher's Kansas Digest, rev. ed., Juries, § 23). In *State v. Frazier,* 54 Kan. 719, 39 Pac. 819, a challenge to the jury array was made because no list of names of prospective jurors had been returned from the city of Salina and no jurors were drawn from that city. Upon appeal this court distinguished *Jenkins* in the following manner:

". . . In that case, no jurors were drawn or summoned from a list made up in accordance with law. In this case, it is not claimed that the jurors in attendance on the court were improperly placed on the list or were persons improperly summoned." (p. 722.)

The court concluded the error in omitting the names of Salina residents was a mere irregularity which did not impair the defendant's constitutional rights to an impartial jury. The rules expressed in our decisions under our prior jury selection statutes appear to be sound in principle and we see no reason why they should not be applicable as well to similar situations under our present jury laws.

As a practical matter it may be said K. S. A. 43-162 requires that voter registration lists be used in compiling jury lists and,

with respect to the instant case, the jurors in attendance were drawn from those lists. The failure to use also the census or enumeration lists is analogous to the failure in *Frazier* to use a list containing the names of residents of the city of Salina. For the instant case to fit the palpable disregard of the law standard of *Jenkins* a complete disregard of our present statute would be required. An example of such complete disregard would be a situation where jury commissioners selected names from some source not mentioned in the statute such as the assessment rolls. Viewing use of voter registration records as the sole source of names for jury selection as a mere irregularity, there is ample support for holding that the irregularity did not invalidate the selection made in this case. However, we think our ultimate decision need not be based on such technical grounds.

The intent of our present legislation is to provide a jury selected from a fair cross section of the community. Such a requirement is fundamental to the jury trial guaranteed by the sixth amendment to the federal constitution (*Taylor v. Louisiana,* 419 U. S. 522, 42 L. ed. 2d 690, 95 S. Ct. 692).

Our petit and grand jurors act of 1971 has the same policy requirements and is otherwise quite similar to the federal Jury Selection and Service Act of 1968 (28 USCS §§ 1861-1866). With slight exception the federal courts hold that selection of jurors from voter registration lists is not statutorily or constitutionally improper. In an annotation at 17 ALR Fed. 590, "Jury Selection Plans" this synopsis of federal law appears:

"The use of either the voter registration lists or the lists of actual voters as the sole source of names of prospective jurors is not a violation of the Act, and is not constitutionally invalid unless there is discrimination in the compilation of such lists." (p. 608.)

As a general rule a challenge based on alleged discrimination in the selection of a jury necessarily requires a showing that a recognizable identifiable class of persons, otherwise entitled to be jury members, has been purposefully and systematically excluded from jury service (*Brown v. Allen,* 344 U. S. 443, 97 L. ed. 469, 73 S. Ct. 397).

Defendants here did make a showing that certain groups tended not to register as voters.

In *United States v. Lewis,* 472 F. 2d 252 (CA3, 1973) it was stated:

". . . We likewise hold that a group of persons who choose not to vote do not constitute a 'cognizable group.' Further, their non-registration is a result of their own inaction; not a result of affirmative conduct by others to bar their registration. Therefore, while a fair*er* cross section of the community may have been produced by the use of 'other sources of names,' the Plan's sole reliance on voter registration lists was constitutionally permissible." (p. 256.)

In *United States v. Anzelmo*, 319 F. Supp. 1106, it was further stated:

"Congress had both anticipated and rejected the argument that the selection of juries from voter lists would not produce a cross section of the community and would discriminate against nonvoters.

" 'In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register to vote. This is not unfair, however, because anyone with minimal qualifications—qualifications that are relevant to jury service— can cause his name to be placed on the lists simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected.' H. Rept. 1087, U. S. Code Cong. and Adm. News 1968, pp. 1794-1795." (pp. 1112-1113.)

See also *Camp v. United States*, 413 F. 2d 419, 421, (CA5, 1969), cert. den. 396 U. S. 968, 24 L. ed. 2d 434, 90 S. Ct. 451, and cases cited therein.

The federal rule that voter registration lists used for the selection of jury panels does not deny a defendant a jury composed of a valid cross section of the community is the same as that applied in our sister states (see for example, *People v. Davis*, 53 Mich. App. 94, 218 N. W. 2d 787; *State v. Fleury*, _____ N. H. _____, 321 A. 2d 108; *State v. Johnson*, (1972), 31 Ohio St. 2d 106, 285 N. E. 2d 751; *State v. Curry*, 262 La. 280, 263 So. 2d 36; *People v. Mc-Dowell*, 27 Cal. App. 3d 864, 104 Cal. Rptr. 181; *State v. Gutierrez*, 187 Neb. 383, 191 N. W. 2d 164) and we think with good reason. Our own statutes require that every juror shall possess the qualifications of an elector and no complaint is made about that. The underlying requisite for such a person to become registered and thus fully eligible for jury service is not of itself burdensome or unreasonable, nor where one chooses not to register can it be said to be the result of government interference or discrimination based on race, color, religion, sex, national origin or economic status. It has long been settled that the list from which prospective jurors are selected need not be a statistical mirror of the community (*Swain v. Alabama*, 380 U. S. 202, 13 L. ed. 2d 759, 85 S. Ct. 824). In the

light of the foregoing our holding is that the use of voter registration records as the sole source of names of prospective jurors results in juries selected from a fair cross section of the community and is not statutorily or constitutionally invalid.

Defendants further contend the selection here was not a true random one and some witnesses at trial did so conclude based upon a narrow interpretation of the word "random" as used in the world of mathematics. The term is defined in Webster's Third New International Dictionary in this fashion: "lacking or seeming to lack a regular plan, purpose, or pattern . . . marked by absence of bias . . . having the same probability of occurring as every other member of a set." The term "at random" receives this definition: "without definite aim, direction, rule, or method: with no specific goal or purpose in view." (p. 1880.) The evidence did indicate that after the first number on the roster in the computer was chosen the remaining numbers did not all have an equal chance to be selected inasmuch as all selections thereafter were preordained but this simply means that all selections were in effect made by the computer at the same time. From this standpoint the system was not true random with strictest mathematical precision. Despite this, we think the spirit of the law authorizing computer use was met. No one arbitrarily chose which person or persons on the voter registration records would be selected for the jury lists. Neither bias nor purpose tainted the method chosen. The entire jury list as a group was selected at random. The particular selection resulted from use of a factor which was not a constant number and names of the group selected could not have been known in advance. We hold the jury in the case at bar was selected at random from a fair cross section of the community in accord with the intent and purposes of the petit and grand jurors act. No discrimination was shown in the compilation of the voting records and no prejudice could have resulted from the selection made.

Our conclusion that the trial court erred in dismissing the indictments and our consequent reversal of those judgments renders it unnecessary to consider the other two orders from which the state has appealed and we turn to defendants' cross-appeals from orders made by Judge Vickers.

Defendants contend the trial court erred in denying their motion to dismiss the conspiracy indictment upon the ground the conspiracy statute is constitutionally invalid because it contains more than one subject and a subject not clearly expressed in its title. The proviso

cited and relied on is article 2, section 16, of the Kansas constitution which states:

"No bill shall contain more than one subject, which shall be clearly expressed in its title. . . ."

The reason for this clause was explained in *State v. Earley*, 192 Kan. 144, 386 P. 2d 221:

"The purpose of the title is [to] call attention to the contents of the bill so members of the Legislature and the general public may be fairly informed as to what the Act implies. . . .

"It is not necessary that the title be an index, a synopsis or abstract of the entire Act in all its details. It is sufficient if the title indicates clearly, though in general terms, the scope of the act. . . .

"The more general the language of the title the broader the subject matter of the Act may be, due reference being given to the requirements of Article 2, Section 16, that the subject matter be clearly expressed in the title. . . ." (pp. 149-150.)

The argument asserting constitutional invalidity for violation of the clause cited is not clear but in any event that proviso was not in anywise violated in the enactment in 1969 of our conspiracy statute, K. S. A. 21-3302, as part of our Kansas Criminal Code. The complete title of this bill (SB No. 9) is: "An Act relating to crimes and punishments; establishing a Kansas criminal code; and repealing [named provisions of K. S. A.]" (Laws 1969, Chap. 180). Clearly a statute establishing conspiracy as a crime is embraced within this broad title—were it not so our entire criminal code would have to be declared invalid.

K. S. A. 21-3302 (1) provides:

"A conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by him or by a co-conspirator."

Perhaps the real thrust of the defendants' argument here, as nearly as can be gleaned from other authority cited, is that our conspiracy statute is invalid because it violates a rule expressed in *Great Lakes Pipe Line Co. v. Wetschensky*, 193 Kan. 706, 396 P. 2d 295, as follows:

"A section of a statute which contains such conflicting and contradictory provisions that intelligent application of its terms is not possible, is so uncertain and ambiguous as to be inoperative and void." (Syl. ¶ 1.)

The short answer to application here of the foregoing rule is that K. S. A. 21-3302 (1) contains no conflicting provisions within itself as was the case in *Great Lakes Pipe Line Co.* Some contention is

also made in this same connection that the proviso "to assist to commit a crime" in our conspiracy statute proscribes the same conduct already covered by our aiding and abetting statute (K. S. A. 21-3205) and it is therefore bad because two subjects are embraced. Not so. Conspiracy is a different crime from aiding and abetting (*United States v. Krol,* 374 F. 2d 776, cert. den. 389 U. S. 835, 19 L. ed. 2d 97, 88 S. Ct. 46). The crucial distinction between the two for present purposes was tersely expressed in *People v. Malotte,* 46 Cal. 2d 59, 292 P. 2d 517.

"Conspiracy, however, is not synonymous with aiding or abetting or participating. Conspiracy implies an agreement to commit a crime; to aid and abet requires actual participation in the act constituting the offense." (pp. 65-66.)

In 15A CJS, Conspiracy, § 35 (1) it is stated:

"[Conspiracy] is an attempt to commit an offense, since its object need not be attained, as discussed infra § 44; it is an enlargement of, but is to be distinguished from, the offense of aiding and abetting the commission of an unlawful act." (pp. 723-724.)

Our statute includes an *agreement* "to assist to commit a crime" in its definition of conspiracy. The trial court in its ruling on the matter properly pointed out that "When the emphasis is turned from aiding and abetting to the *agreement,* which is the essence of conspiracy, it is clear that the statute does not prohibit aiding and abetting, but *agreement* to aid and abet."

Defendants contend the court erred in failing to dismiss the indictments on the ground the conspiracy statute is unconstitutionally vague and indefinite as to the requisite element of intent. The test for determining whether a statute is constitutionally void for this reason was recently stated in *State v. Conley,* 216 Kan. 66, 531 P. 2d 36, as follows:

"The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. If a statute conveys this warning it is not void for vagueness. Conversely, a statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process." (Syl. ¶ 2.)

Defendants' argument here is that the statute fails to require criminal intent with regard to a person who agrees "to assist to commit a crime." They are apparently urging a construction of the conspiracy statute that intent is not a necessary element of conspiracy.

In *Morissette v. United States,* 342 U. S. 246, 96 L. ed. 288, 72 S. Ct. 240, a landmark case in the area of criminal intent, the federal supreme court distinguished statutory crimes dispensing with the element of intent. Such crimes are generally in the regulatory area involving activities which affect public health, safety and welfare. The ultimate decision in *Morissette* was that the mere omission of express mention of intent from a federal statute making it a criminal offense to embezzle, steal, purloin or knowingly convert government property will not be construed as eliminating the element of intent from the crime.

As a general rule a specific intent is essential to the crime of conspiracy (16 Am. Jur. 2d, Conspiracy, § 9). The specific intent required divides into two elements: (*a*) The intent to agree, or conspire, and (*b*) the intent to commit the offense (Harno, "Intent in Criminal Conspiracy" [1941], 89 U. Pa. L. Rev. 624, 631). Defendants concede that the act of conspiring being volitional includes within itself the intent to agree ("Developments in the Law—Criminal Conspiracy," 72 Harv. L. Rev. 920, 935). They urge that the second intent necessary is not provided for in the present statute. In 1, Anderson, Wharton's Criminal Law and Procedure, § 85, it is stated:

"Analytically a dual mental state is present in the case of conspiracy. There is both (1) the intent or agreement of the parties to act together, and (2) the intent to commit an unlawful act or to commit a lawful act by unlawful means, or to do an act jointly which the law makes illegal when done by two or more persons. . . . Because of the obvious practical difficulty of proving the existence of the two distinct intents, the courts generally do not make any distinction between them. Because the intent to conspire is also a criminal act, there is also little distinction made between intent and act, except as reference is made to an overt act in addition to the formation of the conspiracy agreement." (p. 183.)

Defendants' basic proposition is that the conspiracy statute does not require an intent and one may unintentionally violate the statute's proscription and be found guilty.

K. S. A. 21-3302 provides that a conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. The essence is the *agreement to commit a crime,* not simply to commit a particular act, as to drive an automobile at a certain time and place. Clearly a mental state is contemplated. An individual might agree to perform a certain act but it is difficult to conceive how one could unintentionally agree to commit a crime. K. S. A. 21-3201 provides that criminal intent is an essential ele-

ment of every crime and may be established by proof that the conduct of the accused was willful. Willful conduct is defined as knowing and intentional and not accidental. Therefore, an individual could not be found to have unintentionally violated the statute. Full protection against this occurrence will be afforded at trial by instructions to the jury on the factual issue of intent. K. S. A. 21-3302 is not unconstitutionally vague and indefinite.

Defendants contend the trial court erred in overruling their motions to dismiss the conspiracy indictment for the reason it failed to state an offense and was impermissibly vague. The indictment charged that from on or about December, 1971, to on or about April, 1973, in Shawnee county, Kansas, and elsewhere the eighteen individuals and five corporations hereinbefore named ". . . did unlawfully and feloniously combine, conspire, confederate and agree together and with each other, and with Frank Fisher, Kenneth McLain and Robert Brandt, who are co-conspirators, but are not named as defendants herein, and with diverse other persons whose names are to the Grand Jury unknown, to commit the crime of bribery as defined in K. S. A. 1973 Supp. 21-3901 by bribing Richard Malloy, a public employee, and that overt acts in furtherance of the conspiracy and to effect the object thereof were committed, to wit. . . ." The indictment then narrated in considerable detail forty-six separately numbered activities by and between the twenty-three defendants, Richard Malloy and the three named but unindicted co-conspirators in which at certain times and places plans were discussed, made and carried out whereby defendants agreed to and did contribute in varying proportions to Richard Malloy, to be used as campaign funds on behalf of the incumbent Governor of Kansas in his bid for reelection in 1972, payments in the sum of $30,000, being six percent of the fee in architectural contracts for certain proposed work at the Kansas University Medical Center, such payments to Malloy to be made in return for the awarding of these contracts to one of the conspirators as associate architect on the project.

First of all, it may be noted the indictment charges the conspiracy in the language of the statute. K. S. A. 22-3201 (2) provides:

"The complaint, information or indictment shall be a plain and concise written statement of the essential facts constituting the crime charged, which complaint, information or indictment, drawn in the language of the statute, shall be deemed sufficient. . . ."

In *United States v. Salazar*, 485 F. 2d 1272, the requisites for an indictment were discussed:

". . . It has long been settled that an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy. [Citations.] Under this test we have consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." (p. 1277.)

In addition to the general statements contained in the formal part of the indictment, the overt acts stated in the indictment supply further factual detail with regard to the conspiracy. In essence it was stated that each defendant agreed with the others and the unindicted co-conspirators to commit the crime of bribery by bribing Malloy, a public employee, the bribe to be $30,000 or six percent of the contract fee for architectural services in connection with a specific proposed project, and to be paid in return for the awarding of the architectural contract to one of the members of the conspiring group. Since an overt act is part of the offense and is required to be alleged, certainly the overt acts may be used to clarify the remainder of the indictment. This reading of a count of conspiracy as a whole is in accord with modern practice in reading indictments. See *United States v. Kahn*, 381 F. 2d 824, cert. den. 389 U. S. 1015, 19 L. ed. 2d 661, 88 S. Ct. 591. In *United States v. Borland*, 309 F. Supp. 280, it was further stated:

". . . In considering the sufficiency of the statement of the objects of the conspiracy, therefore, reference may be made to the overt acts alleged." (p. 289.)

Defendants' main complaint here is that the indictment did not specify with sufficient particularity the object crime of bribery. The general rule on the subject is stated in 16 Am. Jur. 2d, Conspiracy, § 23, thus:

"Allegations in an indictment for conspiracy are sufficient if the unlawful purpose of the conspiracy clearly appears. The object of the conspiracy need not be stated with the degree of detail that would be required in an indictment charging the substantive offense. If the object is the commission of a crime, it is sufficient to designate the crime by its common-law name, or in the words of a statute defining it." (pp. 139-140.)

In *Williamson v. United States*, 207 U. S. 425, 52 L. ed 278, 28 S. Ct. 163, the indictment alleged conspiracy to suborn perjury. It was there stated:

"But even on the supposition that a valid indictment may be framed charging a conspiracy to commit subornation of perjury, the indictment in

question, it is urged, is fatally defective by reason of an omission to directly particularize various elements, claimed to be essential to constitute the offense of perjury and other elements necessary to be averred in respect to the alleged suborners.

"This is based upon the assumption that an indictment alleging a conspiracy to suborn perjury must describe not only the conspiracy relied upon, but also must, with technical precision, state all the elements essential to the commission of the crimes of subornation of perjury and perjury, which it is alleged is not done in the indictment under consideration. But in a charge of conspiracy the conspiracy is the gist of the crime, and certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is requisite in stating the object of the conspiracy. . . ." (p. 447.)

This ruling was expanded somewhat in *Wong Tai v. United States,* 273 U. S. 77, 71 L. ed. 545, 47 S. Ct. 300, wherein it was stated:

"It is well settled that in an indictment for conspiring to commit an offense —in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, *Williamson v. United States,* 207 U. S. 425, 447, or to state such object with the detail which would be required in an indictment for committing the substantive offense." (p. 81.)

In *Glasser v. United States,* 315 U. S. 60, 86 L. ed. 680, 62 S. Ct. 457, it was further stated:

"The demurrers to the indictment were properly overruled. The indictment is sufficiently definite to inform petitioners of the charges against them. It shows 'certainty, to a common intent.' *Williamson v. United States,* 207 U. S. 425, 447. The particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy, for which petitioners contend, *is not essential to an indictment.* [Citations.] *Such specificity of detail falls rather within the scope of a bill of particulars,* which petitioners requested and received." (p. 66.)

The foregoing trilogy of cases forms the basis for later decisions relied on by the state to support its position that in an indictment for conspiracy to commit a criminal offense, the elements of that offense need not be stated with the same particularity as would be required in an indictment for violation of the substantive offense.

In *Helser v. People,* 100 Colo. 371, 68 P. 2d 543, it was stated:

". . . The reason that the objective crime may be pleaded in the indictment without particularity is, that the crime of conspiracy does not consist in the accomplishment of the unlawful object, or in doing the acts by means of which the desired end is to be attained, but the essence of the offense is the unlawful combination and agreement for any purpose that is unlawful or criminal." (p. 377.)

In the present case the indictment charges the object crime in the following language: ". . . to commit the crime of bribery as defined in K. S. A. 1973 Supp. 21-3901 by bribing Richard Malloy, a public employee. . . ."

Although defendants recognize that the elements of the object crime need not be stated with the same particularity as required in an indictment for violation of the substantive offense, nonetheless, they contend that the present indictment failed to meet the standard necessary to apprise them of the charges against them. They place primary reliance upon *State v. Buttner,* 180 Neb. 529, 143 N. W. 2d 907, which involved a conspiracy to bribe a city councilman. The conspiracy indictment was held invalid because, among other things, it failed properly to allege as the object of the conspiracy that the councilman was to accept the bribe with the intent proscribed by the statute. Additionally the court noted the indictment failed to name the specific councilman who was to be bribed. The latter fact makes the indictment in *Buttner* more suspect than in the present case wherein the individual is definitely named. Moreover, in *Buttner* two members of the court dissented in an opinion solidly fortified with authority contrary to the majority ruling.

Defendants requested and were furnished a bill of particulars describing the powers and duties of Malloy as a public employee and the consideration to be given him to which he was not legally entitled. However, a bill of particulars cannot save an otherwise invalid indictment (*Russell v. United States,* 369 U. S. 749, 8 L. ed. 2d 240, 82 S. Ct. 1038). Nonetheless, as indicated, in considering the sufficiency of the objects of the conspiracy reference may be made to the overt acts alleged and every element of the substantive offense need not be alleged within the conspiracy count. The crux of the matter is that the conspiracy is the crime charged. Certainty to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is requisite in stating the object of the conspiracy (*Williamson v. United States,* supra). The indictment apprised defendants that the object crime was bribery of Richard Malloy, a public employee. The overt acts further defined the charge. The particularity of time, place, circumstances, causes, etc., falls within the scope of a bill of particulars. Our holding is that the indictment sufficiently apprised defendants of the charges they must be prepared to meet and was detailed enough to assure against double jeopardy.

A further reason advanced by defendants for dismissal of the

conspiracy indictment is that it failed properly to charge an offense because Richard Malloy, the alleged taker of the bribe, was also a member of the conspiracy, and bribery is a crime requiring a concert of parties which precludes a conspiracy indictment where both the giver and the taker of the bribe are members of the conspiracy, as held in *United States v. Dietrich*, 126 Fed. 664 and *United States v. Sager*, 49 F. 2d 725. These two decisions enunciate a principle commonly referred to as Wharton's Rule, stated in 1 Anderson, Wharton's Criminal Law and Procedure, § 89, as follows:

"An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission. . . ." (p. 191.)

The classic examples of Wharton's Rule offenses are adultery, incest, bigamy and dueling. The rationale given for the rule is that where the substantive offense itself requires the concerted action of the parties, the conspiracy between the parties to commit the offense adds nothing and is not indictable as a separate offense (*State v. Aircraft Supplies, Inc.*, 45 N. J. Super. 110, 131 A. 2d 571). In *In re Vickers*, 371 Mich. 114, 123 N. W. 2d 253, it was stated with respect to an offense involving concert of action between two persons:

". . . the immediate effect of consummation reaching only the participants, as also in respect to adultery, bigamy, incest, or dueling, in which a charge of conspiracy to commit the offense will not lie against the 2 participants. This is because the conspiracy to commit them is in such close connection with the objective offense as to be inseparable from them." (p. 117.)

Traditionally, conspiracy and the completed substantive offense have been considered to be distinct and separate crimes so that conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act (*Iannelli v. United States*, 420 U. S. 770, 43 L. ed. 2d 616, 95 S. Ct. 1284; 1 Anderson, Wharton's Criminal Law and Procedure, § 87). In *Iannelli* it was stated:

". . . the Rule [Wharton's] currently stands as an exception to the general principle that a conspiracy and the substantive offense that is its immediate end do not merge upon proof of the latter. . . .

"This Court's prior decisions indicate that the broadly formulated Wharton's Rule does not rest on principles of double jeopardy. [Citations.] Instead, it has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary. The classic Wharton's Rule offenses— adultery, incest, bigamy, duelling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense.

The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large. [Citations.] Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert. It cannot, for example, readily be assumed that an agreement to commit an offense of this nature will produce agreements to engage in a more general pattern of criminal conduct." (pp. 781-784.)

Thus, the rule is applicable only to offenses that require concerted action. In both *Dietrich*, supra, and *Sager*, supra, it was held the substantive offense of bribery required a concert of action between the giver and taker of the bribe before the crime could be committed. Therefore, the rule was held applicable and a conspiracy indictment was improper.

There are recognized exceptions to Wharton's Rule. It has been held the rule does not apply when the substantive offense could be committed by one of the conspirators alone (1 Anderson, Wharton's Criminal Law and Procedure, § 89, p. 192). Another exception applies in the case in which more people participate in the conspiracy than are necessary to commit the substantive offense. For example, although under the rule two persons who commit adultery cannot be prosecuted for that offense and conspiracy to commit it, the exception would permit the conspiracy charge where a third party had conspired with the principals to encourage commission of the substantive offense (1 Anderson, Wharton's Criminal Law and Procedure, § 89, p. 193).

It appears that both these exceptions are applicable here. The indictment indicates that certain individuals named in the conspiracy were neither givers nor takers of the alleged bribe. Malloy was not named as a participant in the conspiracy itself but rather was named as the object of certain overt acts committed by the co-conspirators, some of whom were givers and thus essential parties to the crime of bribery and some of whom were not givers and thus were not essential parties to the crime of bribery, in furtherance of their conspiracy to bribe him. In *United States v. Corallo*, 281 F. Supp. 24, the defendants were charged with conspiracy, because of alleged attempted bribery, to violate a statute making it an offense to travel in interstate or foreign commerce or to use any facility in that commerce with the intent of furthering an unlawful that the indictment failed to charge an offense. The contention was activity. The defendants filed a motion to dismiss on the ground based on the authority of *Sager*. The court stated in pertinent part:

"The only givers alleged among the conspirators were to be Fried and S. T. Grand, Inc. But the conspiracy is alleged to have included persons who were neither givers nor takers: Itkin, Motto, Rappaport, and the movant Corallo; their parts are not specified in detail but it is clear that they were to unite their efforts to accomplish the unlawful object. This is a classic charge of conspiracy, in no way affected by any cases cited to show it as defective.

Because the conspiracy included persons whose participation was not essential to the offense of bribery, the principle of such cases as *United States v. Sager*, 49 F. 2d 725, 727-729 (2d Cir. 1931) does not apply. 'The principle is . . . limited to cases where the essential participants are the only conspirators. Where those whose cooperation is necessary for the commission of the substantive crime conspire with another person to commit the offense, all are guilty of conspiracy.' 1 Wharton's Criminal Law and Procedure (1957 ed.) 193." (p. 29.)

See also, *United States v. Smolin*, 182 F. 2d 782; *United States v. Cogan*, 266 F. Supp. 374; *People v. Incerto*, 180 Colo. 366, 505 P. 2d 1309.

Additionally, in Kansas the substantive crime of bribery can be committed by one person. K. S. A. 21-3901 defines bribery to include "offering" or "requesting" improper benefits, etc. Thus the mere offer or solicitation of a bribe is violative of the statute and a concert of action is unnecessary to commit the substantive offense of bribery. In *People v. Incerto*, supra, it was stated:

". . . The substantive offense of bribery of a judge, 1967 Perm. Supp. C. R. S. 1963, 40-7-5 (repealed 1971), can, in fact, be committed by one person. Prior to 1967, the statute required both 'giving' and 'receiving' as elements of the offense of bribery. Therefore, the participation of two people was necessary. Two people were also necessary under the bribery statute which we reviewed in *People v. Wettengel, supra. See* Compiled Laws of Colorado 1921 § 6781. The legislature, however, has amended our bribery statute, and the revision now makes an 'offer to give' or an 'offer to receive' a bribe a crime under the statute." (pp. 371, 372.)

In *United States v. Cogan*, supra, it was stated:

"An offer does not require concert of action; it is an action capable of performance unilaterally." (p. 377.)

The distinction was even made in *United States v. Dietrich*, supra:

"In this respect, agreeing to receive a bribe from another and agreeing to give one are unlike soliciting or offering a bribe, because the solicitation or offer may be the act of a single person and may occur without any concurrent act of another." (p. 667.)

An indictment for conspiracy to bribe is proper under the factual situation alleged and Wharton's Rule is inapplicable.

Defendants also urge the trial court erred in not dismissing the

conspiracy indictment on the ground it is duplicitous. They contend the indictment charges two or three conspiracies unrelated to the charge of bribing Malloy. We think there is no merit to this contention.

As a general rule an indictment must not in the same count charge the accused with the commission of two or more distinct substantive offenses and if it does so it is duplicitous (42 CJS, Indictments and Informations, § 162). The vice of duplicity is that the jury is unable to convict of one offense and acquit of another offense where both are contained in the same count (1 Wright, Federal Practice and Procedure, Criminal § 142, p. 311).

In *United States v. Wenzel*, 311 F. 2d 164, an indictment charged eleven persons with conspiracy to violate statutes relating to possession, sale and utterance of counterfeit money. It was asserted the evidence disclosed several conspiracies rather than the single conspiracy charged in the indictment. The court there stated:

". . . Reference is made to various meetings or activities in each of which some, but not all, of the conspirators participated; and the argument apparently is that each of these represented a separate conspiracy comprising only the individuals present or participating. There is plainly no merit in this. It is fundamental that it is not necessary that every act undertaken in carrying out the object of a conspiracy should be participated in by every member of the conspiring group. In carrying out the purpose of a conspiracy it will be found that in practically every case different groups played different parts. To unite them in a single conspiracy it is only necessary that the activities of each individual or group be directed toward accomplishing a single criminal objective." (p. 167.)

In *United States v. Crummer*, 151 F. 2d 958, cert. den. 327 U. S. 785, 90 L. ed. 1012, 66 S. Ct. 704, it was stated:

"Coming to the question whether the indictment was duplicitous, it is well settled that duplicity in criminal pleading is the joinder of two or more separate and distinct offenses in the same count in an indictment or information, not the charging of a single offense involving a multiplicity of ways and means of action and procedure." (p. 963.)

Defendants place sole reliance upon the case of *Kotteakos v. United States*, 328 U. S. 750, 90 L. ed. 1557, 66 S. Ct. 1239. There the indictment charged thirty-two defendants with conspiracy to obtain loans under the National Housing Act on false and fraudulent applications. Aside from the fact that one defendant, Brown, had been the instrument in each instance for obtaining the loans, in many cases the other defendants did not have any relationship with one another. There were at least eight separate groups which had no

connection with any others although all dealt independently with Brown as their agent. There were separate loans to separate people for separate purposes. It was held there must be more relationship between the parties than a common agent and that a common object was absent. In the present case there is a single common criminal objective charged in the indictment—the kickback contribution to Malloy in return for award of the architectural contract. The indictment charges only one conspiracy and this is not changed by the assertion of more than one means used to accomplish the object (*United States v. Johnson*, 337 F. 2d 180; *United States v. Perez*, 489 F. 2d 51; *United States v. Simone*, 495 F. 2d 752).

Certain of the defendants have urged that as to them the indictment should have been dismissed because neither the agreement nor any overt act in which they participated is alleged to have been committed in Shawnee county. To the contrary, the indictment specifically alleges that the conspiratorial agreement, in which the complaining defendants took part, occurred in Shawnee county. Also, the indictment alleged that ten of the separately numbered overt acts occurred in Shawnee county. It is immaterial that the particular complainants may never have entered Shawnee county during the existence of the conspiracy. The applicable rule was expressed in *Downing v. United States*, 348 F. 2d 594, cert. den. 382 U. S. 901, 15 L. ed. 2d 155, 86 S. Ct. 235, in this fashion:

"The contentions of the appellant are foreclosed both by statute, 18 U. S. C. A. § 3237, and by court decisions. A conspiracy may be prosecuted in the district where it was formed or in any district in which an overt act was committed in furtherance of its objects. [Citations.] The place where the conspiracy was formed is immaterial if at least one of the overt acts alleged and proved took place within the district where the defendant is tried. [Citations.] It is not essential that the defendant ever enter the state or district of trial. . . ." (p. 598.)

Our own jurisdictional statute, K. S. A. 21-3104, provides:

"*Territorial applicability.* (1) A person is subject to prosecution and punishment under the law of this state if:

"(*a*) He commits a crime wholly or partly within this state; or

"(*b*) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state; or

. . . . . .

"(2) An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state . . .,"

and our venue statute, K. S. A. 22-2603, states:

"Where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur."

Thus it seems clear the trial court had authority to try all the defendants.

Defendant Malloy contends the trial court erred in denying his motion to dismiss the indictment against him on the ground our bribery statute is unconstitutionally vague and indefinite. K. S. A. 21-3901 provides:

"*Bribery.* Bribery is:

"(*a*) Offering, giving or promising to give, directly or indirectly, to any public officer or public employee any benefit, reward or consideration to which he is not legally entitled with intent thereby to influence such officer or employee with respect to the performance of his powers or duties as such officer or employee; or

"(*b*) The act of a public officer or public employee, in requesting, receiving or agreeing to receive, directly or indirectly, any benefit, reward or consideration given with intent that he will be so influenced. . . ."

Malloy is charged as a public employee under subsection (*b*). His complaint is that this portion of the statute fails to indicate the intent of the influence proscribed. The contention lacks merit. Related statutory provisions are to be considered together and in their entirety in determining legislative intent (*Welch v. Board of Education,* 212 Kan. 697, Syl. ¶ 2, 512 P. 2d 358). Subsection (*a*) of the bribery statute prescribes this intent for the offeror of a bribe: ". . . with intent thereby to influence such officer or employee;" subsection (*b*) then states "with intent that he [a public officer or employee] will be so influenced." Even the most cursory reading of the statute reveals that the intent in subsection (*b*) was meant to be the same as that in (*a*).

Defendant Malloy next asserts that the phrase in the bribery statute "with intent thereby to influence such officer or employee with respect to the performance of his powers or duties as such officer or employee" is unconstitutionally vague. He argues the statute could be interpreted to proscribe offering money to a public employee provided the latter agreed to do a better job, work longer hours, and the like.

The statute denounces offering to a public officer or employee some benefit to which he is not lawfully entitled. The state argues, and we think correctly so, that the legislature intended to proscribe all such transactions irrespective of whether the individual making the offer reaps any benefit. In *United States v. Irwin,* 354

F. 2d 192, cert. den. 383 U. S. 967, 16 L. ed. 2d 308, 86 S. Ct. 1272, a similar federal statute was attacked upon the same ground. The court there stated:

"The awarding of gifts thus related to an employee's official acts is an evil in itself, even though the donor does not corruptly intend to influence the employee's official acts, because it tends, subtly or otherwise, to bring about preferential treatment by Government officials or employees, consciously or unconsciously, for those who give gifts as distinguished from those who do not. . . . The iniquity of the procuring of public officials, be it intentional or unintentional, is so fatally destructive to good government that a statute designed to remove the temptation for a public official to give preferment to one member of the public over another, by prohibiting all gifts 'for or because of any official act,' is a reasonable and proper means of insuring the integrity, fairness and impartiality of the administration of the law. . . .

"The appellant seeks to prove his point by suggesting hypothetical cases taken from the peripheral areas of the statute's scope; but he can derive no assistance from that source. He must show that, as applied to his own case, the statute was so vague and uncertain that he was not presented with an 'ascertainable standard of guilt.'" (p. 196.)

We think the indictment sufficiently informed the defendant of the nature of the charge against him.

Finally, defendants assert the trial court erred in denying their request for inspection and copying of all statements secured by the state as a result of inquisitions held pursuant to K. S. A. 22-3101, both before and after the indictments were returned, and of other documents in the state's files which are favorable to defendants. The trial court did grant limited discovery of certain matters as requested but denied the blanket request for inspection of the entire prosecution files in order to determine if there was any exculpatory material. Rather than allow defendants unlimited inspection the prosecution submitted the files to the trial judge for *in camera* inspection. After such inspection the judge held the files contained nothing of an exculpatory nature. Defendants assert a right to inspect the material personally to make their own determination as to its exculpatory nature.

The prosecuting attorney is under a positive duty to disclose to the defense all exculpatory evidence (*Brady v. Maryland,* 373 U. S. 83, 10 L. ed. 2d 215, 83 S. Ct. 1194). However, this does not entitle the defendant to unlimited discovery of the state's files (*Williams v. Dutton,* 400 F. 2d 797, cert. den. 393 U. S. 1105, 21 L. ed. 2d 799, 89 S. Ct. 908, appeal after remand 431 F. 2d 70, adhered to 441 F. 2d 657, vacated in part 408 U. S. 938, 33 L. ed. 2d 758, 92 S. Ct. 2867, rehearing denied 409 U. S. 898, 34 L. ed. 2d 164, 93

S. Ct. 179). In 2 Wharton's Criminal Procedure, 12th ed., § 381, it is stated:

"Absent a statute providing otherwise, the defendant is not entitled, as a matter of right, to the discovery or inspection of evidence in the possession of the prosecution. Whether, in a particular case, discovery should be allowed is a question for the trial judge in his discretion to resolve. In order to qualify for discovery, the defendant must make a request for the evidence sought, and the request must be timely. The defendant must show that the evidence requested is in the possession or control of the prosecution, and that it is relevant, or material to the preparation of his defense. The mere entertaining of a hope that something of aid may be discovered is not sufficient." (pp. 361-368.)

Where the prosecution refuses a request for inspection resort may be had to *in camera* inspection by the court to determine whether the requested information is materially favorable to the defendant (*United States v. Quinn*, 364 F. Supp. 432).

In an annotation in 7 ALR 3d 8 entitled "Discovery—Prosecution's Evidence", it is stated in § 7:

"The defendant must show some better cause for inspection than a mere desire for all information which has been obtained by the prosecution in its investigation of the crime. The production of the prosecution's evidence is not allowed to the defendant for exploratory purposes or for the purpose of prying into the prosecution's preparation for trial. The defendant has no right to invoke the means of examining the prosecution's evidence merely in the hope that something may turn up to aid him. A blanket request for production of the prosecution's evidence will not be granted. The defendant's motion for production of the prosecution's evidence must be based on facts, and not on conclusions or mere surmise and conjecture." (pp. 50-51.)

Defendants were unable to specify what material in the prosecution files was exculpatory. They made the general assertion that in the files there undoubtedly were items of evidence favorable to some of them. Such a blanket assertion fails to justify inspection. Moreover, the court conducted an *in camera* inspection of the material which protected the defendants from dependence on the benevolence of the prosecutor in determining whether there was any favorable information in the files.

Additionally, K. S. A. 22-3213 provides that no statement of a prospective state witness shall be subject to inspection until the witness has testified at the preliminary hearing or on direct examination at trial. The present matter has not reached either of the foregoing stages. Thus the request for inspection as to statements of prospective state witnesses was premature.

Defendants further assert they need to inspect inquisition statements obtained after return of the indictments in order to guard

against abuse of the inquisition process. This request for inspection must fail for the reason previously stated, *i. e.*, lack of specificity of material sought. Abuse of discretion in the rulings complained of has not been shown.

The judgments dismissing the indictments are reversed. The orders challenged by way of cross-appeal are affirmed and the cases are remanded to the trial court for further proceedings.

APPROVED BY THE COURT

FROMME, J., not participating.