No. 54,720

STATE OF KANSAS, *Appellee,* v. SUEANNE SALLEE HOBSON, *Appellant.*

(671 P.2d 1365)

134

Opinion filed October 21, 1983.

*Scott Harrison Kreamer,* of Gardner, Davis, Kreamer, Norton, Hubbard & Ruzicka, Chartered, of Olathe, argued the cause and was on the brief for the appellant.

*Stephen R. Tatum,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Dennis W. Moore,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Sueanne S. Hobson (defendant-appellant) guilty of first-degree murder (K.S.A. 21-3401 and K.S.A. 21-3205) and conspiracy to commit murder (K.S.A. 21-3302). The appellant contends the trial court erred in numerous aspects, including the admission of previous statements made by various witnesses, the exclusion of hearsay statements and psychiatric

expert testimony, failing to dismiss the charges because of inquisitions conducted by the State without proper authority, failing to dismiss one of the charges as duplicitous, and ordering the sentences to run consecutively.

The facts will be briefly stated since the appellant does not challenge the sufficiency of the evidence. The victim, thirteen-year-old Christen Hobson (Chris), was reported missing from his home in Overland Park by his father, Ed Hobson, on April 17, 1980. For several days Ed and his wife Sueanne Hobson assisted police in the search for Chris. During this time Chris's billfold was found at a shopping center in Overland Park. On May 3, 1980, Chris's body was found in a shallow grave in rural Miami County by two boys fishing nearby. Death was caused by shotgun blasts at close range to the head and chest.

Jimmy Crumm, Sueanne Hobson's seventeen-year-old son and Chris's stepbrother, was taken into custody later that day and gave a statement to police officers admitting his participation in the murder and implicating the appellant. Crumm told officers his mother had told him on several occasions that something had to be done about Chris, and asked him if he could help her get rid of him. At the appellant's insistence he and a friend, Paul Sorrentino, picked Chris up at his home on April 17, 1980, drove him to Miami County in the appellant's car, dug a grave, shot Chris at close range while he was sitting in the grave and covered his body with dirt. His mother told him later she threw Chris's billfold away at the shopping center. He further stated his mother had promised to buy him a car and pay for repairs on Sorrentino's motorcycle as their payment for killing Chris. Crumm was convicted of first-degree murder in Miami County, which was affirmed by this court on appeal in *State v. Crumm,* 232 Kan. 254, 654 P.2d 417 (1982). Sorrentino pled guilty to aiding and abetting first-degree murder. Both men testified to the above facts at trial.

Sueanne Hobson was taken to police headquarters for questioning in the late evening on May 3, 1980. During the questioning she admitted having learned from Jimmy on April 18, 1980, that Chris had been killed, but did not tell anyone because she was frightened and wanted to protect her son. Detectives went to the Hobson home between 5:30 and 6:00 a.m. on May 4 and questioned the appellant's thirteen-year-old daughter, Su-

zanne Hobson. Quickly discerning she had information concerning her mother's involvement in the murder the detectives transported her to police headquarters where they tape recorded an interview with her beginning at 6:38 a.m. and ending at 6:50 a.m. Suzanne told officers during the interview that Christen had been causing problems between Ed and Sueanne, and Sueanne had told Jimmy Crumm that something had to be done about Chris. The day of Chris's disappearance Suzanne overheard Jimmy tell the appellant he and someone else were going to take Chris out and "get rid of him." The appellant told Jimmy she would get Ed out of the house that night. Later that day the appellant told Suzanne she was supposed to stay upstairs and take a shower when Jimmy came over to pick up Chris. Her mother told her a few days later that Jimmy took Chris out and "took care of him," by which Suzanne thought the appellant meant Chris had been killed. She also stated her mother told her she threw Chris's billfold away at the shopping center.

Following the interview with Suzanne the detectives tape recorded an interview with the appellant. Sueanne told officers that because Chris had been causing problems by threatening Suzanne she had asked Jimmy to talk to Chris and knew that Jimmy and his friend were going to take Chris out that night and try to scare him so he would leave Suzanne alone. When she found out the next day from Jimmy what had happened she was afraid to tell her husband. She admitted taking Chris's billfold to the shopping center the day after his disappearance. At trial the appellant testified she asked Jimmy to talk to Chris about the problems he was causing at home, hoping this would help "get rid of" the problems. This tactic had apparently been successful with Chris before. She denied ever talking to Jimmy about killing Chris. The day after Chris's disappearance Jimmy called and said Sorrentino had killed Chris and had said he would kill all of them if she told anyone. She testified Jimmy took Chris's billfold to the shopping center the next day, but that she had told police earlier that she had done it to protect Jimmy. She did not tell her husband or police what had happened to Chris for fear of what Sorrentino would do to her family and of what her husband would do to Jimmy and Sorrentino if he found out.

To bolster the appellant's story several defense witnesses were called who testified Jimmy had stated often that he hated

Chris and was angry with him for telling his parents that he used drugs and had stolen some credit cards. The appellant's mother testified Jimmy had told her in February 1980 that he would "get even" with Chris. She further testified that after Jimmy's arrest he told her that he and Sorrentino had made up a story about the murder in case they got caught and that his mother had nothing to do with it.

The appellant was convicted of both charges and has duly perfected this appeal. Further facts will be developed when necessary to discuss the issues raised.

The appellant first contends the conspiracy charge is duplicitous of the first-degree murder charge and should have been dismissed. The appellant argues that under the instructions given the jury relied upon the same evidence to convict her of both crimes, violating the constitutional prohibition against double jeopardy.

In *Jarrell v. State,* 212 Kan. 171, 173, 510 P.2d 127 (1973), it was recognized that two or more separate convictions cannot be carved out of one criminal delinquency and where numerous charges are made, those which make up an integral part of another crime charged, in which the defendant was convicted, must be dismissed as duplicitous. In *Jarrell* the charges were held to be duplicitous where the defendant was charged with rape, assault with felonious intent, and taking a woman for defilement, all based on one act of violence on one woman. The test for duplicity was stated to be whether each of the offenses charged requires proof of an additional element of the crime which the other does not and if an additional fact is required, the offenses are not duplicitous. 212 Kan. at 175. See also *State v. Garnes,* 229 Kan. 368, 373, 624 P.2d 448 (1981); *State v. Mourning,* 233 Kan. 678, 679, 664 P.2d 857 (1983).

The appellant was charged with first-degree murder as an aider and abettor under K.S.A. 21-3205, which provides in pertinent part:

"(1) A person is criminally responsible for a crime committed by another if he intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."

A person convicted of aiding and abetting under this statute is equally guilty with the person actually committing the crime. See *State v. Payton,* 229 Kan. 106, 112, 622 P.2d 651 (1981);

Comment, PIK Crim. 2d 54.05. To show guilt of one who aids and abets, the law requires that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture. See *State v. Williams,* 229 Kan. 646, 661, 630 P.2d 694, denying rehearing of 229 Kan. 290 (1981); *State v. McDaniel & Owens,* 228 Kan. 172, 178, 612 P.2d 1231 (1980); Comment, PIK Crim. 2d 54.05. To establish the crime of conspiracy under K.S.A. 21-3302 two essential elements must be established: (1) an agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy. *State v. Daugherty,* 221 Kan. 612, Syl. ¶ 4, 562 P.2d 42 (1977).

It has long been recognized by this court and other authorities that conspiracy is a separate and distinct crime from aiding and abetting. The distinction between the two crimes was aptly discussed in *State v. Campbell,* 217 Kan. 756, 769, 539 P.2d 329, *cert. denied* 423 U.S. 1017 (1975):

"Conspiracy is a different crime from aiding and abetting (*United States v. Krol,* 374 F.2d 776, cert. den. 389 U.S. 835, 19 L. ed. 2d 97, 88 S.Ct. 46). The crucial distinction between the two for present purposes was tersely expressed in *People v. Malotte,* 46 Cal. 2d 59, 292 P.2d 517.

" 'Conspiracy, however, is not synonymous with aiding or abetting or participating. Conspiracy implies an agreement to commit a crime; to aid and abet requires actual participation in the act constituting the offense.' (pp. 65-66.)

"In 15A CJS, Conspiracy, § 35(1) it is stated:

" '[Conspiracy] is an attempt to commit an offense, since its object need not be attained, as discussed infra § 44; it is an enlargement of, but is to be distinguished from, the offense of aiding and abetting the commission of an unlawful act.' (pp. 723-724.)

"Our statute includes an *agreement* 'to assist to commit a crime' in its definition of conspiracy. The trial court in its ruling on the matter properly pointed out that 'When the emphasis is turned from aiding and abetting to the *agreement,* which is the essence of conspiracy, it is clear that the statute does not prohibit aiding and abetting, but *agreement* to aid and abet.' "

This distinction is also noted in 16 Am. Jur. 2d, Conspiracy § 3:

"Conspiracy is a separate and distinct offense from that of aiding and abetting. It involves the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common in aiding and abetting."

Proof of aiding and abetting the commission of a crime does

not prove all the elements required to prove conspiracy, namely that a prior *agreement* to commit the crime existed between the defendant and perpetrator. Conversely, proof of conspiracy does not establish the defendant actually took part in furthering the success of the venture. Therefore, conspiracy and aiding and abetting are two separate and distinct crimes and are not duplicitous.

The appellant recognizes this principle of law but contends under the instructions given the jury was allowed to use evidence of the same conduct to convict her of both crimes. Several instructions were given for each crime charged. The trial court instructed in No. 8 that to establish the murder charge the jury must find James Crumm and Paul Sorrentino killed Chris Hobson maliciously, willfully, deliberately and with premeditation, and "that either before or during the commission of the crime, and with the intent to promote or assist in the commission of the crime, defendant intentionally aided, hired, advised or counselled another to commit the crime." Instructions 9, 9A, and 10 respectively read:

"A person is criminally responsible for the conduct of another when, either before or during the commission of a crime, and with the intent to promote or assist in the commission of the crime, he intentionally aids or advises the other to commit the crime."

"A person who intentionally aids, abets, advises, hires or counsels another to commit a crime is responsible for any other crime committed in pursuance of the intended crime, if the other crime was reasonably foreseeable.

"A person who intentionally aids, abets, advises, counsels or procures another to commit a crime may be prosecuted in any county where any of such acts were committed."

On the charge of conspiracy the trial court instructed in No. 11, in pertinent part, as follows:

"1. That the defendant agreed with another person to assist in the commission of the crime of murder in the first degree;

"2. That the defendant did so agree with the intent that the crime of murder in the first degree be committed;

"3. That the defendant or any party to the agreement acted in furtherance of the agreement by murdering Christen Hobson."

Instruction No. 12 further stated:

"A conspiracy is an agreement with another or other persons to commit a crime or to assist in committing a crime, followed by an act in furtherance of the agreement."

The appellant argues the terms hire, procure, advise and counsel used in the aiding and abetting instructions are virtually synonymous with the element of agreement necessary to establish the conspiracy charge, and under the facts of this case and instructions given, the jury relied upon the appellant's single act of hiring or procuring Crumm and Sorrentino to kill Chris to establish both the agreement for the conspiracy charge and the participation in the furtherance of the crime for the aiding and abetting charge. However, we have held duplicity does not depend upon whether the facts proved at trial are actually used to support conviction of both offenses; rather, it turns upon whether the necessary elements of proof of the one crime are included in the other. *State v. Chiles,* 226 Kan. 140, 143, 595 P.2d 1130 (1979); *State v. Lora,* 213 Kan. 184, Syl. ¶ 4, 515 P.2d 1086 (1973). The facts tending to establish the appellant hired or procured others to kill Chris would not, standing alone, have established the additional element of an overt act required to support the charge of conspiracy. Likewise, that evidence would not have proved the appellant's participation in the venture in furtherance of its success, as required to establish the aiding and abetting charge. The facts presented at trial established the appellant's participation in the actual commission of the crime independent of her involvement in the prior conspiracy with Crumm and Sorrentino to find a way to "get rid of" Chris. The appellant informed Jimmy that April 17 would be a good day to carry out the plan since Ed would be home late that night. She provided her car for Jimmy to use to drive Chris to a suitable place to carry out the crime. She disposed of Chris's billfold at the shopping center to hinder investigation of the matter by making it look like Chris had run away. She told Jimmy she would make sure Ed was out of the house that night and told Suzanne to be upstairs in the shower when Jimmy came over to get Chris.

The validity of the instructions to the jury is to be gauged by consideration of the whole, each in conjunction with all other instructions in the case. *State v. Korbel,* 231 Kan. 657, Syl. ¶ 6, 647 P.2d 1301 (1982); *State v. Childers,* 222 Kan. 32, Syl. ¶ 5, 563 P.2d 999 (1977). Taken as a whole the jury instructions given by the trial court properly set forth the law on the theories asserted by the State to establish the appellant's guilt. Each of the of-

fenses charged required evidence of an additional element which the other did not, and under the instructions given the convictions for conspiracy and aiding and abetting were not duplicitous.

The next issue raised by the appellant involves sworn statements taken by the district attorney from four witnesses prior to trial. The witnesses were subpoenaed by the district court upon application by the State pursuant to K.S.A. 22-3101, the inquisition statute. The appellant was not notified that the statements were to be taken and was not present or represented by counsel. The appellant subsequently filed a motion to dismiss, charging the prosecution had violated the statutory requirements for deposing witnesses set forth in K.S.A. 1982 Supp. 22-3211. The district court denied the motion, ruling the State's inquiry had not prejudiced the appellant. The court ordered that the appellant be provided with copies of the statements and be allowed to conduct the taking of her own depositions of these witnesses with the prosecutor present. *None of these witnesses were called to testify at trial by either the State or the appellant.*

On appeal the appellant contends the prosecution unlawfully deposed witnesses without a court order and without defense counsel being notified and in attendance, as required by K.S.A. 1982 Supp. 22-3211. She alleges this resulted in extreme prejudice to her and violated her right to equal protection by affording the State an unfair and improper advantage in prosecuting the charges, since the appellant had no comparable statutory right to obtain statements of or depose prosecution witnesses prior to trial. In support of her claim of prejudice she points out that had the State not taken a prior sworn statement of one of the witnesses, Dr. Chester Day, the State would not have been prepared to move in limine to exclude Dr. Day's testimony and Dr. Day would have been called to testify as planned for the defense.

The State argues it properly compelled inquisition testimony of the witnesses after charges had been filed against the appellant under K.S.A. 22-3101, which provides in part:

"(1) If the attorney general, an assistant attorney general, or the county attorney of any county is informed or has knowledge of any alleged violation of the laws of Kansas, such person may apply to a district judge to conduct an inquisition. An application for an inquisition shall be in writing, verified under oath, setting forth the alleged violation of law. Upon the filing of the application, the judge with whom it is filed shall, on the written praecipe of the attorney general, assistant

attorney general or county attorney, issue a subpoena for the witnesses named in such praecipe commanding them to appear and testify concerning the matters under investigation. Such subpoenas shall be served and returned as subpoenas for witnesses in criminal cases in the district court.

. . . .

"(3) Each witness shall be sworn to make true answers to all questions propounded to him or her touching the matters under investigation. The testimony of each witness shall be reduced to writing and signed by the witness. Any person who disobeys a subpoena issued for such appearance or refuses to be sworn as a witness or answer any proper question propounded during the inquisition, may be adjudged in contempt of court and punished by fine and imprisonment."

Although the record does not contain the appellant's motion to dismiss, the court's ruling on the motion or any other documents relevant to this issue, it appears from the briefs that the State made the required verified application to the district court, the subpoenas were issued by a judge other than the trial judge, and that statements were taken in the judge's chambers.

Relying on the phrase "matters under investigation" the appellant argues that once an accused is bound over for trial and the prosecution has commenced, the matter is no longer under investigation and the procedure in 22-3101 for obtaining information from witnesses is no longer available to the prosecutor. It is argued that at that point discovery by the State is limited to the taking of depositions as provided by K.S.A. 1982 Supp. 22-3211(3).

The precise issue presented is whether, under K.S.A. 22-3101, a district attorney may properly conduct an inquisition concerning charges pending against an accused after the accused has been bound over for trial following a preliminary hearing. The power of the county prosecutor to conduct inquisitions to investigate criminal matters cannot be doubted. In *Southwestern Bell Tel. Co. v. Miller*, 2 Kan. App. 2d 558, 561, 583 P.2d 1042, *rev. denied* 225 Kan. 845 (1978), the court stated:

"There can be no doubt that the county prosecutors of this state, along with the attorney general, have a duty to investigate all criminal activity which comes to their attention, and that the inquisition statute is a primary tool entrusted to them by the legislature to assist in that function. [Citations omitted.] If information about criminal activity is in the hands of an individual, it can clearly be acquired by compelling that individual's testimony."

In *State v. Jones*, 202 Kan. 31, 47, 446 P.2d 851 (1968), the court held it was proper for the county attorney to obtain a witness's

testimony concerning the charges against the defendant at a hearing on a contempt citation held some time after the preliminary examination, stating:

"The investigatory powers of the state do not end with the conclusion of a preliminary examination, and the state has the right and duty at any stage of the proceeding to ascertain what a witness may testify to at trial."

Other cases have recognized that under both K.S.A. 22-3101 and its predecessor, K.S.A. 62-301 (Corrick), the county attorney may properly hold inquisitions after a prosecution has commenced. In *State v. Brecheisen*, 117 Kan. 542, 543, 232 Pac. 244 (1925), the county attorney held an inquisition and compelled sworn statements from some of the defendant's witnesses after the prosecution had commenced and the defendant had subpoenaed his witnesses. In holding this did not constitute error the court stated:

"The action may be unusual, as defendant contends, but the statute makes it the duty of the county attorney to hold inquisitions where he is notified or gains knowledge of the violation of the law relating to intoxicating liquors and some other offenses. He is then empowered to subpoena any witness he has reason to believe has knowledge concerning the offenses under inquiry. (R.S. 62-301.) The county attorney may have had information that defendant had committed other offenses than the one charged in the pending prosecution, but whether he did nor not he was only exercising the authority that the statute confers, and we have no right to assume that he was not acting in good faith or that he was abusing legal process."

In a more recent case involving the State's use of its inquisition powers, *State v. McQueen & Hardyway*, 224 Kan. 420, 582 P.2d 251 (1978), an inquisition was held during an evening recess in the trial to determine if a witness was justified in claiming a Fifth Amendment privilege against self-incrimination. The defendants were later informed of the inquisition and the nature and extent of the witness's testimony. Similar to the arguments advanced by the appellant here, the defendants argued on appeal that this process denied them equal protection and due process of law since it gave the State an improper advantage. The court rejected this argument, holding:

"When a witness called by the state refuses to testify and claims the Fifth Amendment privilege against self-incrimination, the court may hold a hearing in chambers to determine if the claim is justified or on the application of the prosecutor the court may hold inquisition proceedings under K.S.A. 22-3101, *et seq.*, to determine the validity of such claim." 224 Kan. at 429.

The cases demonstrate that in the past the use of inquisitions has not been judicially limited to preindictment proceedings. The two cases cited by the appellant are from other jurisdictions and do not support her position. The statute itself contains no language expressly limiting the time when the inquisition procedure may be used. The appellant argues, however, that because the article concerning inquisitions appears in the Code of Criminal Procedure prior to the article entitled "Proceedings Before Trial" and following Articles 29 and 30 addressing post-arrest and grand jury procedures, it was the legislature's intent to limit the use of inquisitions to preindictment proceedings. This court has previously recognized the placement of a law in a particular location in the general statutes by the compiler is not persuasive as to the intent of the legislature that enacted it. *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, Syl. ¶ 3, 610 P.2d 1107 (1980). The fact that the legislature has not been prompted to amend the statute to impose time limitations on the use of the inquisition process despite previous case law addressing this subject suggests the process was intended to be used after prosecution has commenced as well as before.

The appellant further argues that if the prosecuting attorney is entitled to extract testimony from witnesses prior to trial through inquisitions, the deposition statute, 22-3211, is rendered useless. The deposition statute, however, provides a method to preserve testimony in the event a material witness will be unavailable for trial and sets forth strict rules under which such testimony may be admitted as evidence at trial. The inquisition statutes, on the other hand, are designed to permit the district attorney or attorney general to subpoena and question witnesses in order to investigate criminal matters and the extent of an accused's involvement in such activities. This testimony is not admissible at trial.

There is no support for the appellant's argument that the inquisition procedure can only be pursued before a defendant is charged and bound over for trial. The statements of the witnesses were made available to the appellant prior to trial and she was offered the opportunity to take her own depositions of the witnesses. None of these witnesses testified at trial and their inquisition testimony was not offered as evidence by the State. The appellant was not in any way prejudiced by the inquisitions

conducted by the county attorney and the trial court properly overruled the appellant's motion to dismiss.

The next two points raised by the appellant involve the State's examination of Suzanne Hobson, the appellant's daughter, and the admission of a tape recording of an interview of Suzanne by detectives on May 4, 1980. During the interview Suzanne made several statements incriminating her mother and Jimmy Crumm in Christen's murder. Specifically she told the detectives she had overheard a conversation between her mother and Jimmy in the parking lot of his apartment building the day of Chris's disappearance, during which her mother said something had to be done about Chris and Jimmy said he would take Chris out and get rid of him.

When asked by the State on direct examination at trial what she had overheard during the conversation Suzanne testified she was in the car and did not hear anything. The prosecutor then attempted to question Suzanne about the contradictory statements made by her during the interview. Defense counsel objected to the leading nature of the questions. The State argued Suzanne was a turncoat witness and under K.S.A. 60-243 they were entitled to cross-examine her. The court directed the State to allow the witness to refresh her recollection with a transcript of the interview. Suzanne refused to read through the transcript, however, stating she remembered what she said during the interview. Upon further questioning by the prosecution she testified she did not recall any more about the conversation between her mother and Jimmy after having reviewed her prior statements. The court then ruled Suzanne was a hostile witness, stating:

"[T]he court realizes the relationship of this witness to the defendant and the Court realizes when she reviewed the statement and looked it over that she said she didn't need to. She went over it and didn't look at it that closely. From her reactions the Court finds that she is a turncoat witness. The Court will allow the State to cross-examine her."

The State proceeded to cross-examine Suzanne about the statements made by her during the interview with police on May 4, 1980. Suzanne admitted telling the police that Jimmy and another person were going to take Chris out and get rid of him, that on April 17, 1980, she overheard her mother and Jimmy say "[s]omething had to be done about Chris," that her mother had

said she would get Ed out of the house, that her mother told her to be upstairs in the shower when Jimmy came over, and that her mother threw the billfold away. When asked whether her mother and Jimmy were going to kill Chris, Suzanne told police, "[t]hey didn't really say that word for word, they were just going to get rid of him." She also told police her mother told her Jimmy went out and "took care of" Chris. (A portion of the transcript setting forth the witness's testimony in further detail is reproduced in an appendix to this opinion.)

Suzanne was cross-examined at length by defense counsel concerning these and other statements made during the interview. During cross-examination she did not suffer any apparent loss of memory concerning her prior statements. On redirect Suzanne stated she had not told the truth during the interview.

John Douglass, one of the detectives present during the interview, was called by the State to testify about the circumstances surrounding the interview. Over defense counsel's objection the tape recording of the interview was then played for the jury.

The appellant first contends the trial court erred in declaring Suzanne to be a hostile witness and allowing the State to examine her through leading questions. This court has held that while ordinarily a party may not impeach his own witness, nor offer evidence for that purpose, he is not conclusively bound by the statements which the witness may make; and where a party has been entrapped or deceived by an artful or hostile witness, he may examine such witness as to whether he had not previously made contrary statements, and may, in the discretion of the court, be permitted to show what such contrary statements were. *State v. Potts,* 205 Kan. 47, 51, 468 P.2d 78 (1970); *State v. Collins,* 204 Kan. 55, 59, 460 P.2d 573 (1969); *State v. Jones,* 202 Kan. 31, 48, 446 P.2d 851 (1968). K.S.A. 60-243(*b*) provides that a party may interrogate any unwilling or hostile witness by leading questions. As a rule the mere fact a witness has failed to testify as expected does not warrant impeachment by proof of prior statements in conformity with what he was expected to testify. The witness's testimony must be affirmative, contradictory and adverse to the party calling him to allow impeachment of that witness by cross-examination. See *State v. Potts,* 205 Kan. at 51-52, *State v. Lomax & Williams,* 227 Kan. 651, 659-60, 608 P.2d 959 (1980).

The appellant contends there is absolutely nothing in Suzanne's testimony which indicates in any way she was hostile. We disagree. Suzanne denied overhearing any conversation between her mother and Jimmy, rather than merely claiming she couldn't remember, as the appellant contends. Evidence of this conversation was necessary to support the charges against the accused. Suzanne's testimony was affirmative, contradictory and very damaging to the State's case. Furthermore, the determination of whether a witness is hostile is to be made by the trial judge, in the exercise of a sound judicial discretion and may be based upon such circumstances as the demeanor of the witness, his situation and relationship to and with the parties, his interest in the case and the inducements he may have for withholding the truth. See 81 Am. Jur. 2d, Witnesses § 430. The trial judge heard the testimony of the witness, observed her demeanor and her reluctance to cooperate with the prosecutor by refusing to read her previous statement to refresh her memory, and was advised of the changes in her testimony. The relationship of the witness to the appellant provided strong incentive for her to change her story at trial. Under these circumstances the trial court did not abuse its discretion in declaring Suzanne hostile. The evidence of her prior inconsistent statements was admissible as substantive evidence, as well as for the purpose of impeachment, under K.S.A. 1982 Supp. 60-460(*a*). See *State v. Holt*, 228 Kan. 16, 22, 612 P.2d 570 (1980); *State v. Fisher*, 222 Kan. 76, Syl. ¶ 2, 563 P.2d 1012 (1977); *State v. Lott*, 207 Kan. 602, 606, 485 P.2d 1314 (1971); 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(a), p. 229-30 (1979).

The appellant contends the admission of the tape recording of the interview violated her Sixth Amendment right of confrontation, relying on *State v. Lomax & Williams*, 227 Kan. 651. In *Lomax* the State called a witness who had previously testified at the preliminary hearing of a codefendant. When the witness stated on direct examination she could not remember anything that had happened concerning the charges, the court declared her a hostile witness and allowed the prosecutor to cross-examine her about her testimony from the preliminary hearing. Her response at trial continued to be that she could not recall anything concerning the incident in question nor any of her testimony at the preliminary hearing. On cross-examination by de-

fense counsel the witness again answered she could not remember anything. This court held where the witness simply refused to testify at trial by claiming she could not remember what happened, her prior hearsay statements were not admissible for purposes of impeachment or examination of a hostile witness, because the witness was not available for cross-examination by the defendant within the meaning of K.S.A. 60-460(*a*) and as required by a defendant's constitutional right to confront witnesses. 227 Kan. 651, Syl. ¶ 3. By simply refusing to testify, the witness's testimony was not affirmative, contradictory or adverse to the party calling her as required for prior hearsay statements to be used to impeach the witness under *State v. Potts,* 205 Kan. at 51-52.

The case at bar does not fall within the rule of *State v. Lomax & Williams* for two reasons. First, Suzanne did not simply claim she could not remember anything that had happened around the time of Chris's disappearance or any of the statements she had made during the interview. Rather, she changed her story altogether and stated she did not overhear any part of the conversation between her mother and Jimmy, and then refused to read over a transcript of her prior statements at trial to refresh her recollection. As heretofore stated, these actions were contrary and adverse to the State.

Secondly, and more importantly, prior to the time when the tape recording was admitted Suzanne was thoroughly examined by the State and cross-examined by the defense concerning her prior statements. Suzanne admitted making most of the statements but offered explanations as to what she meant by them and later attempted to discredit the statements by testifying that she had not told the truth during the interview. Under K.S.A. 60-422(*b*) extrinsic evidence of prior contradictory statements made by the witness is admissible in the discretion of the trial judge where the witness is given an opportunity while testifying to identify, explain or deny the statements. See *State v. Murrell,* 224 Kan. 689, 692-93, 585 P.2d 1017 (1978); *Smith v. Blakey, Administrator,* 213 Kan. 91, Syl. ¶ 6, 515 P.2d 1062 (1973); *State v. Ford,* 210 Kan. 491, 496, 502 P.2d 786 (1972); 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-422, p. 118 (1979).

The State complied fully with the provisions of K.S.A. 60-422(*b*). The witness was available for cross-examination by the

defendant within the meaning of 60-460(*a*). Accordingly, the appellant was not denied her constitutional right to confrontation and the trial court did not err in admitting the tape recording of Suzanne's prior statements.

The next point raised by the appellant concerns the admission of a prior consistent statement made by Jimmy Crumm. Jimmy testified on direct examination that around 11:45 p.m. on May 3, 1980, he was taken to the Overland Park police station and questioned by officers about his involvement in the murder of Christen Hobson. At that time he admitted he and Paul Sorrentino had shot Chris at his mother's behest. After waiving his *Miranda* rights he gave an oral statement which was recorded in handwriting by one of the officers. He then affixed his signature at the bottom of each page and initialed each paragraph. On cross-examination he testified he was drunk at the time of his arrest and when the statement was given. On both direct and cross-examination he was questioned about inconsistencies between his trial testimony and his prior statement. He admitted he had not been truthful about some aspects of the killing, particularly the gauge of shotgun used by him, what he had done with the shotgun after the killing, and whether he or Sorrentino had actually shot Chris. Defense counsel questioned Jimmy at length concerning the extent to which he was under the influence of alcohol and drugs at the time of the killing and when he made the statement to police, whether or not he suffered from any mental disease or defect, his history of stealing and the extent of his personal dislike for Chris.

Following the conclusion of the appellant's case the court ruled Jimmy's credibility had been impeached by the testimony of the defense witnesses and allowed the prior statement to be admitted on rebuttal by the State. The appellant contends the court erred in admitting the statement in evidence because Jimmy had not been impeached, the statement did not rehabilitate him and he admitted being drunk when the statement was made.

As a general rule where a witness has been impeached or his credibility as a witness has been attacked, prior statements consistent with his testimony at trial may be shown to rehabilitate or support the witness. See *State v. Yurk*, 230 Kan. 516, Syl. ¶ 1, 638 P.2d 921 (1982); *State v. Scott*, 210 Kan. 426, Syl. ¶ 3, 502

P.2d 753 (1972); *State v. Parrish,* 205 Kan. 178, Syl. ¶ 2, 468 P.2d 143 (1970); *State v. Fouts,* 169 Kan. 686, Syl. ¶ 4, 221 P.2d 841 (1950); *State v. Marshall & Brown-Sidorowicz,* 2 Kan. App. 2d 182, Syl. ¶ 20, 577 P.2d 803, *rev. denied* 225 Kan. 846 (1978). Whether a witness has been impeached must be determined under the facts of each case. Impeachment occurs when a suggestion is made by direct proof or by the nature of an examination that a witness has testified falsely for hope of reward, promise of immunity, fear or malice. *State v. Scott,* 210 Kan. at 431.

The record reflects the testimony of Jimmy Crumm at the appellant's trial was sufficiently impeached to properly admit his prior statement for the purpose of rehabilitation. The testimony of several defense witnesses directly contradicted much of Jimmy's testimony. The appellant denied ever talking with Jimmy about killing Chris, asking him to find someone to help her get rid of Chris, or agreeing to buy him a car or pay for Sorrentino's motorcycle repairs in exchange for the killing. Jimmy's grandmother testified that shortly after his arrest Jimmy called her from jail and told her he and Sorrentino had made up a story in case they got caught, his confession was "a pack of lies" and his mother had nothing to do with the killing. She also testified before the murder Jimmy had threatened to kill Chris to get even with him for telling on him. Jimmy's roommate and a girl he had dated both testified Jimmy hated Chris.

The gist of this evidence suggested to the jury that Jimmy had fabricated his testimony concerning his mother's involvement in the crime as an excuse for his actions or out of malice towards his mother. The testimony of the witness was clearly impeached. The contention that the statement did not serve to rehabilitate the witness and should not have been admitted because of the witness's condition at the time the statement was given is without merit. With the exception of the few inconsistencies brought out on direct and cross-examination at the trial, the prior statement corroborated every detail of Jimmy's testimony concerning the appellant's involvement in the murder. It has been recognized that for a prior statement to be admissible it must be relevant and voluntary, and it should appear that there is a real or substantial similarity between the sworn and unsworn statements. 81 Am. Jur. 2d, Witnesses § 654. There is no claim the

statement was not voluntarily given. Evidence of the physical and mental condition of the witness at the time of the statement would go to the weight and credibility to be given the statement by the jury, rather than its admissibility. Furthermore, no contemporaneous objection was made at trial by defense counsel to the admissibility of the statement on the basis of the witness's condition when the statement was made. Under the facts in this case the trial court did not err in admitting the prior consistent statement of the witness.

The appellant next contends the trial court erred in refusing to allow defense counsel to cross-examine Ed Hobson concerning a statement made by him on direct examination. In response to a question by the State concerning the disposition of the furniture in Chris's room after his disappearance, Mr. Hobson answered:

"I took part of it down to work to a couple of men down there that had families that, you know, could use it and the rest of it we gave to an ex-friend of Sueanne's, Marjorie Hunt Fugate."

On cross-examination defense counsel inquired what the witness had meant by describing Ms. Fugate as an "ex-friend." The State objected that this line of questioning was beyond the scope of direct examination. Defense counsel argued the area had been gone into by the State on direct examination and therefore they were entitled to make further inquiry into the matter on cross-examination. Ms. Fugate had not yet been called to testify at trial. The trial court ruled the characterization of Ms. Fugate as an "ex-friend" by Mr. Hobson was not relevant at that time and sustained the objection.

The law is clear that cross-examination may be permitted into matters which were the subject of the direct examination. *Humphries v. State Highway Commission,* 201 Kan. 544, 547, 442 P.2d 475 (1968). Where a general subject matter has been opened up on direct, cross-examination may go to any phase of the subject matter and is not restricted to identical details developed or specific facts gone into on the direct examination. *State v. Puckett,* 6 Kan. App. 2d 688, 694, 634 P.2d 144 (1981), *aff'd* 230 Kan. 596, 640 P.2d 1198 (1982). Questions asked on cross-examination must be responsive to testimony given on direct examination, or material and relevant thereto; and resolution of such issues resides in the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of

abuse of the exercise of the power of discretion. *State v. Norwood,* 217 Kan. 150, 154, 535 P.2d 996 (1975); *State v. Nirschl,* 208 Kan. 111, Syl. ¶ 5, 490 P.2d 917 (1971); *Humphries v. State Highway Commission,* 201 Kan. at 547.

The subject of the question and response at issue here was the disposition of the furniture in Chris's bedroom after his disappearance. This subject was developed further on direct examination. The relationship between the appellant and Ms. Fugate was not inquired into by the State at any time during direct examination of Mr. Hobson, and was only hinted at by the witness's reference to Ms. Fugate as an "ex-friend." This fleeting comment was not elicited by the State and does not constitute a subject matter of the direct examination. Ms. Fugate later testified as a prosecution witness and was fully cross-examined regarding her past and present relationships with the appellant. The attempted cross-examination of Mr. Hobson by defense counsel was not relevant or material to the subject matter addressed on direct examination. We find the trial court did not abuse its power of discretion in sustaining the State's objection to this line of questioning.

The appellant complains about the admission into evidence of slides showing X-rays of the victim's wounds and photographs depicting the gravesite and the uncovered body of Christen Hobson in the grave. The appellant contends that because the cause of death and the circumstances surrounding the actual shooting were undisputed, the photographs and slides were "irrelevant, inflammatory, prejudicial and without probative value."

The rules pertaining to the admission of photographs in a criminal prosecution are well established and often repeated by this court. Recently in *State v. Garcia,* 233 Kan. 589, 592-93, 664 P.2d 1343 (1983), we summarized the rules as follows:

"In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. See, *e.g., State v. Green,* 232 Kan. 116, 118, 652 P.2d 697 (1982), and cases cited therein. Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Campbell,* 210 Kan. 265, 276, 500 P.2d 21 (1972); *State v. Dargatz,* 228 Kan. 322, 329, 614

P.2d 430 (1980); *State v. Henson,* 221 Kan. 635, 647, 562 P.2d 51 (1977). Photographs depicting the extent, nature and number of wounds inflicted are generally relevant in a first-degree murder case. *State v. McCorgary,* 224 Kan. 677, 681, 585 P.2d 1024 (1978). Photographs are erroneously admitted when they are unduly repetitious, gruesome, and add nothing to the State's case. *State v. Dargatz,* 228 Kan. at 329, *State v. Henson,* 221 Kan. at 647; *State v. Clark,* 218 Kan. 18, 24, 542 P.2d 291 (1975)."

See also *State v. Crump,* 232 Kan. 265, 271, 654 P.2d 922 (1982).

The photographs and slides admitted in this case are neither gruesome nor repetitive. The four photographs depicting the gravesite and surrounding area corroborated the testimony of Jimmy Crumm and Paul Sorrentino regarding the manner in which the killing was accomplished. The slides showing the X-rays of the victim's wounds to the chest, face and skull supported and illustrated the pathologist's testimony concerning the cause of death. These photographs and slides are not similar to those found to be inadmissible in *State v. Boyd,* 216 Kan. 373, 377, 532 P.2d 1064 (1975), upon which the appellant relies. None of these photographs or slides were unduly prejudicial to the appellant's case. We find no error in the admission of these photographs and slides.

The next two points raised by the appellant involve the testimony of Marjorie Hunt Fugate. Over defense counsel's objections Ms. Fugate was permitted to testify as follows:

"Q. During this period of time, March and April of 1980, did Sueanne on occasion discuss Chris Hobson with you?

"A. Yes, we discussed him a lot also, ever since he first—ever since he first came into the family we would discuss him.

"Q. I want to particularly direct your attention to March and April of 1980.

"A. (Witness nods head up and down.)

"Q. Up to April the 17th, 1980. At that point in time was she making comments to you about Christen Hobson?

"A. Yes, she made comments a lot about him.

"Q. And what did she say?

"A. She said she hated him and she wished that he was gone, she wanted him out.

. . . .

"Q. During this period of time did you have a conversation with Sueanne Hobson where the name Sorrentino was brought up?

"A. Yes.

"Q. Would you relate that conversation between yourself and Sueanne Hobson?

"A. She asked me if I knew of anyone in the Mafia, she asked me if I had any idea how much it would cost to have somebody done away with and she asked me if I had ever heard the name Sorrentino connected with the Mafia."

The appellant contends this testimony constituted inadmissible hearsay under 60-460 and did not fall within any exception to the hearsay rule.

This testimony clearly fell within the hearsay rule as it was evidence of a statement made other than by a witness while testifying at trial offered to prove the truth of the matter asserted. See K.S.A. 1982 Supp. 60-460; *Thompson v. Norman,* 198 Kan. 436, 441, 424 P.2d 593 (1967). The State argues, however, the testimony was properly admitted under K.S.A. 1982 Supp. 60-460(l) as a statement of the declarant's then-existing state of mind indicating plan, intent, motive or design. This exception to the hearsay rule provides:

> "*Statements of physical or mental condition of declarant.* Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts of conduct of the declarant . . . ."

This provision is concerned with the declarant's state of mind existing at the time of the utterance. Such declarations necessarily include an element of *res gestae,* if not true spontaneity. See *Thompson v. Norman,* 198 Kan. at 444; 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(1) (1979). In *People v. Ireland,* 70 Cal. 2d 522, 529, 75 Cal Rptr. 188, 450 P.2d 580 (1969), it was held under a similar California statute that this exception is available only when the declarant's state of mind (1) is itself an issue in the case or (2) is relevant to prove or explain acts or conduct of the declarant. See also 4 Louisell & Mueller, Federal Evidence § 442 (1980); 4 Weinstein's Evidence § 803(3) [02, 03] (1981).

Case law involving this exception to the hearsay rule is sparse in Kansas. Many commentators have recognized that under the corresponding federal rule, Fed. R. Evid. 803(3), statements showing the declarant's state of mind may be admitted to show motive, ill will or intent. 4 Weinstein's Evidence § 803(3) [03]; Louisell & Mueller, Federal Evidence § 442, p. 554 (1980); 2 Jones on Evidence § 10:8 (6th ed. Gard 1972); 29 Am. Jur. 2d, Evidence § 650. Vernon's Kansas C. Civ. Proc. § 60-460, p. 519-20 (1965), quoting Slough, *Spontaneous Statements and State of Mind,* 46 Iowa L. Rev. 224, 230-31 (1961), states:

"It is not necessary to show as a condition of admissibility that the declarant is unavailable as his extra-judicial assertions are supposedly more reliable than his subsequent testimony in court which might suffer from defect of memory or deliberate misstatement.

"When a declaration is used to evidence a state of mind directly in issue, one encounters little difficulty in justifying the admission of the declaration. State of mind has to be proved in some way and frequently other evidence is nonexistent or inadequate. . . .

. . . .

"A declaration asserting an emotion is admissible under the present exception to prove the state of mind of the individual making the declaration. Statements of this type are frequently employed in homicide prosecutions to prove malice or ill will. . . ."

In 2 Wharton's Criminal Evidence § 307, pp. 100-01 (13th ed. 1972), it is stated:

"In general, every declaration by the defendant, which is relevant to the issues involved in the trial, is admissible in evidence against him, if it shows his intent or motive for the crime charged, explains the character of his conduct, or serves to identify the author of the crime. Thus, in a prosecution for unlawful homicide, a declaration by the appellant that the deceased was 'one man he was going to have to kill,' or that the defendant was a straight shot and a game man, was admissible to show malice and a predisposition to engage in criminal conduct. Likewise, a declaration by the defendant indicating that he was in an ugly frame of mind and disposed to commit some crime, though not the particular crime for which he was on trial, was admissible to show his state of mind."

Courts from other jurisdictions have admitted hearsay statements made by an accused prior to the commission of the crime to show the accused's state of mind relating to intent, motive or plan under Fed. R. Evid. 803(3) or corresponding state statutes. In *United States v. Partyka*, 561 F.2d 118, 125 (8th Cir. 1977), *cert. denied* 434 U.S. 1037 (1978), it was held statements made by a defendant during a conversation with an undercover informant were admissible as manifestations of his present state of mind under Fed. R. Evid. 803(3). In *State v. Mincey*, 130 Ariz. 389, 406, 636 P.2d 637 (1981), statements made by the defendant prior to the incident in question describing his intention to use firearms to protect himself if confronted by police were admissible during the defendant's prosecution for second-degree murder as bearing directly on the issues of intent and premeditation. See also *United States v. Wilkinson*, 513 F.2d 227, 233 (7th Cir. 1975); *United States v. Dellinger*, 472 F.2d 340, 380 (7th Cir. 1972), *cert. denied* 410 U.S. 970 (1973); *State v. Saiz*, 103 Ariz. 567, 569, 447 P.2d 541 (1968).

It is clear under K.S.A. 1982 Supp. 60-460(l) spontaneous statements made by a defendant prior to the commission of a crime are admissible to show intent, plan, motive, design, malice or ill will where the defendant's state of mind is an issue in the case or is relevant to prove or explain acts or conduct of the defendant. The testimony complained of by the appellant falls within this exception to the hearsay rule. The appellant's statements that she hated Chris and wished he were gone were evidence of the appellant's ill feelings toward Chris and therefore probative of intent and motive at the time of his death. The statement concerning the cost of having someone "done away with" by the Mafia, while not directly related to Chris, was relevant to show her state of mind concerning a plan or design. The latter statement was particularly relevant in light of the State's theory that the appellant actually had hired individuals, namely her son Jimmy and Paul Sorrentino, to "do away with" Chris. The statements were relevant to prove or explain acts or conduct of the declarant and therefore were admissible under K.S.A. 1982 Supp. 60-460(l).

The next point raised by the appellant concerns an instruction on the aiding and abetting charge, which read:

"A person who intentionally aids, abets, advises, hires or counsels another to commit a crime is responsible for any other crime committed in pursuance of the intended crime, if the other crime was reasonably foreseeable."

The appellant contends it was error for the trial court to give this instruction for two reasons. First, no evidence was introduced by the State that the appellant hired or counseled Crumm and Sorrentino to commit any crime other than to kill Chris, so there was no basis for instructing the appellant was responsible "for any other crime committed in pursuance of the intended crime."

The record on appeal shows sufficient evidence was presented, however, from which the jury could have found the appellant intended or believed Jimmy would do more than just talk to Chris. During her interrogation by police the appellant stated she knew Jimmy and another boy were going to take Chris out and scare him by threatening to beat him up to get him to leave Suzanne alone at home. Other evidence established the appellant talked to Jimmy the day of Chris's disappearance and stated something had to be done about Chris and Jimmy told her

he would "get rid of" him. Evidence was also admitted of a statement made by Suzanne Hobson to police to the effect that when her mother told her Jimmy had taken care of Chris she "didn't know what to think . . . if they just beat him up real—just enough to put him in the hospital or not."

The appellant also argues the jury should have been additionally instructed on the elements necessary to establish the underlying crime or crimes which the appellant intended Crumm and Sorrentino to commit. Under the instruction given if the jury believed the appellant had intentionally aided, hired or counseled Crumm and Sorrentino to commit a crime, she could be found guilty of the crime charged if it was reasonably foreseeable that it would be committed in pursuance of the intended crime. The appellant contends the jury must first determine under proper instructions whether those actions which the appellant intended Crumm and Sorrentino to carry out constituted a crime, before they can determine if it was reasonably foreseeable that the crime charged would be committed in pursuance of the intended crime.

The evidence presented by the State established at the very least that the appellant wanted Crumm and Sorrentino to take Chris somewhere and either threaten him with bodily harm or actually cause him bodily harm in order to scare him. Had this been done the evidence would have been sufficient to establish that one or more crimes had been committed and that the appellant had intentionally aided and abetted in the commission of those crimes. See, e.g., K.S.A. 21-3408 (assault); K.S.A. 21-3412 (battery); K.S.A. 21-3414 (aggravated battery). The trial court found the instruction was proper based on the evidence presented that the appellant intended to have Chris scared or beaten up. We agree. The evidence was sufficient to establish that a crime would have been committed if the intended conduct had been carried out, and therefore it was not necessary for the jury to be instructed on the elements of those crimes. The jury was entitled to draw all reasonable inferences of fact from the evidence and use common knowledge and experience in regard to matters about which a witness has testified, and could have found from the evidence the appellant intended for a crime to be committed other than the crime charged and that she intentionally aided in the commission of the intended crime.

The appellant next contends the trial court erred in excluding hearsay statements offered to prove Jimmy Crumm's feelings toward the victim. The defense made a proffer of evidence that Detective Steve Moore would testify he interviewed David Reffitt, a cousin of Jimmy Crumm, three weeks after Chris's body was found, at which time Reffitt stated Jimmy Crumm had told him in February before Chris's disappearance that he did not like Chris and at one point discussed taking him out and killing him. Jamie Bradley, a girl who had dated Jimmy, was also expected to testify that a girl named Michelle Dartez told her Jimmy had stated at one time he was going to cut Chris to ribbons with his knife. Neither Reffitt nor Dartez could be located by defense counsel to be subpoenaed for trial. The appellant contends Reffitt and Dartez were unavailable to testify and therefore their statements were admissible as a matter of necessity under K.S.A. 1982 Supp. 60-460(*d*)(3), which states:

"(*d*) *Contemporaneous statements and statements admissible on ground of necessity generally* . . . .

. . . .

"(3) If the declarant is unavailable as a witness, by the declarant at the time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

To admit hearsay statements under this provision the trial court must find (1) the declarant is unavailable as a witness, (2) the matter described was recently perceived by the declarant and the statement made while his memory was fresh, and (3) the statement was made under circumstances so as to show that it was in good faith, before there was an action pending, and with no incentive to falsify or distort. 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d), p. 240 (1979). The trial court is necessarily given considerable discretion in admitting statements under this exception. Vernon's Kansas C. Civ. Proc. § 60-460(d) (1965); 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d) (1979). In *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.2d 684 (1974), we held that under this provision the presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances. See also *State v. Brown*, 220 Kan. 684, 688, 556 P.2d 443 (1976).

There is no question that had Michelle Dartez and David Reffitt been available as witnesses, the statements made to them

by Jimmy Crumm would have been admissible under K.S.A. 1982 Supp. 60-460(*l*) as a statement of Crumm's then-existing state of mind, or K.S.A. 1982 Supp. 60-460(*j*) as a declaration against interest. However, these statements are highly suspect because they are actually double hearsay: out-of-court statements by Michelle Dartez and David Reffitt about statements allegedly made by yet a third person, Jimmy Crumm. This is precisely the type of testimony which the hearsay rule is designed to exclude. See K.S.A. 60-463. The appellant argues there was no evidence of bad faith by the declarants and no incentive for them to falsify or distort the statements allegedly made by Crumm. However, no evidence was presented before the trial court from which this determination could have been made. In answer to the appellant's argument that Reffitt's statements were admissible because he was unavailable, the court stated:

"THE COURT: Well, counsel, that's not the only question here, it's reliability and there are quite a few conditions in here with respect to incentive to falsify or distort.

"[Appellant's counsel]: What incentive could this cousin have if he's his cousin to distort it?

"THE COURT: Counsel, I don't know. The point is, I don't know, and there are a lot of questions here that the witness, Mr. Reffitt, would need to be present to make those determinations. The Court has some very serious reservations about allowing a statement of someone who is not available."

The trial court further found cross-examination of the declarants was essential because of the nature of the statements. The trial court apparently felt there was some risk the statements were not made in good faith or the declarants had some incentive to falsify or distort the statements attributed to Jimmy. Under the circumstances of this case it would have been imperative for the State to have the opportunity to cross-examine the declarants to test the reliability and truthfulness of their statements. We find the trial court did not err in refusing to admit these statements as exceptions to the hearsay rule.

The appellant contends the trial court erred in refusing to allow the appellant to present expert psychiatric testimony by Dr. Chester Day that the appellant did not have the mental capacity to contract, hire or procure someone to commit a murder for her. Dr. Day met with and counseled the appellant approximately 81 times beginning May 16, 1980, one week after Chris's body was found, and continuing through July 1981. The appel-

lant contends this type of evidence is no different from expert evidence concerning a criminal defendant's ability to distinguish right from wrong where an insanity defense is asserted at trial. The appellant concedes the proffered evidence would embrace the ultimate issue of guilt or innocence, but argues that is not sufficient to disallow such testimony.

The admission of expert testimony is controlled by K.S.A. 60-456(*b*), which reads:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The basis for the admission of expert testimony is the need to assist the jury under the facts of the particular case. *State v. Garcia*, 233 Kan. 589, 598, 664 P.2d 1343 (1983). We have repeatedly held that opinion testimony is not without limitations and although an expert witness may be permitted to give an opinion bearing on the ultimate issue he may do so only insofar as the opinion will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence. *State v. Garcia*, 233 Kan. 598; *State v. Moore*, 230 Kan. 495, 497, 639 P.2d 458 (1982); *Massoni v. State Highway Commission*, 214 Kan. 844, Syl. ¶ 3, 522 P.2d 973 (1974). In addition, an expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury. *State v. Moore*, 230 Kan. at 497; *State v. Reed*, 226 Kan. 519, 521, 601 P.2d 1125 (1979).

It is well settled that expert opinions are admissible on the issue of sanity or insanity in criminal prosecutions because it is an area where expert opinion is particularly useful and often-times necessary to interpret for the jury the manifestations of mental derangement and the significance of symptoms. See *State v. Garcia*, 233 Kan. 598-99 and authorities cited therein. No case law or other authorities are cited by the appellant which state evidence of a defendant's mental capacity to commit a specific act is admissible where an insanity defense has not been raised and insanity is not an issue. The appellant did not raise an insanity defense in the instant case.

The ultimate issue of fact to be determined by the jury was

whether the appellant did or did not commit the crimes charged. The proffered opinion testimony by Dr. Day, based on his contact with the appellant subsequent to the time when the crime was committed, was that she could not have committed the crime because she lacked the mental capacity to do so. This evidence squarely embraced the issue to be determined by the jury. As stated above expert opinion testimony is permitted only insofar as it "will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence." The facts presented by the evidence were neither technical, complicated nor beyond the average experience and common understanding of the jury. In rendering a verdict the jury was required only to weigh the evidence and pass on the credibility of the witnesses. Either they believed the appellant's version of the events or the version presented by the prosecution witnesses. The opinion evidence proffered by the appellant encroached directly upon the jury's exclusive province to determine from the evidence whether or not the appellant actually committed the crime, and therefore was properly excluded by the trial court.

The appellant next contends the trial court erred in overruling her motion for new trial because the court did not read the authorities cited by the appellant in support of the motion. The granting of a new trial is a matter of discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of discretion. A new trial in a criminal case may be granted on motion of a defendant when required in the interest of justice, and such grant in the first instance lies within the sound discretion of the trial court. *State v. Chiles,* 226 Kan. 140, 148, 595 P.2d 1130 (1979). The same points raised by the appellant in support of her motion for new trial were raised on appeal and have been discussed herein. The trial judge presided over the case with a great deal of care, giving due consideration to all issues and objections raised by the appellant during trial. No new issues were raised by the appellant in the motion for new trial. We find the trial court did not abuse the exercise of its power of discretion in overruling the appellant's motion for a new trial.

Finally, the appellant asserts the trial court erred in ordering the sentences imposed on the two counts to run consecutively.

The appellant was sentenced to life for first-degree murder and five to fifteen years for conspiracy to commit murder. Relying on her argument that the two charges are duplicitous, the appellant contends she was sentenced to two confinements for one act. Since we have determined the two convictions were not duplicitous this point is without merit. A sentence imposed by a trial court will not be disturbed on appeal provided it is within the limits prescribed by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression or corrupt motive. *State v. Coberly,* 233 Kan. 100, Syl. ¶ 5, 661 P.2d 383 (1983). No showing has been asserted by the appellant that the sentence imposed was the result of an abuse of the exercise of the trial court's power of discretion and it will not be disturbed on appeal.

The judgment of the lower court is affirmed.

### APPENDIX

"Q. (By Mr. Moore) Suzanne, I'm handing you what's been marked for identification purposes as State's Exhibit 15 and ask if you would take a few minutes and look through that, please.

"A. (The witness complies with the request.)

"Q. First let me just ask, have you ever seen that before?

"A. Yes.

"Q. Do you know when you saw that?

"A. Not when, no.

"Q. Do you know where you were when you saw that?

"A. Probably at the preliminary.

"Q. All right. But you have seen that document before?

"A. Yes, I have.

"Q. Would you look through that, please.

"A. I have. (The witness complies with the request.)

"Q. What is that, Suzanne?

"A. It's the interview I made with Detective Douglass and Steve Moore the night—the morning that they found Chris' body.

"Q. That would have been May 4th, 1980, is that correct?

"A. Yes.

. . . . .

"Q. (By Mr. Moore) Suzanne, have you refreshed your recollection by looking through this statement?

"A. Yes, once.

"Q. Once what?

"A. I've read through it.

"Q. Well, have you looked through it today and do you remember what you said by looking at this?

"A. I haven't read it today, no.

"Q. Do you want to do that?

"A. No.

"Q. Well, I'm going to ask you some questions about it. Do you want to do it before I ask you some questions?

"A. No.

"Q. Why not?

"A. Because I've already read it.

"Q. So you remember what you said?

"A. Yes.

"Q. All right. Okay. Did you tell—did you tell Detective Douglass on May 4, 1980, that—

"MR. SCOTT KREAMER: Your Honor, I'm going to object, it's leading the witness.

"THE COURT: Sustained.

"Q. (By Mr. Moore) Referring back to the conversation you overheard between your mother and Jim on April 17 in the parking lot at Jim's apartment—

"A. What about it?

"Q. Do you recall it?

"A. Yeah, I remember being there.

"Q. All right. Now, having looked at this statement do you recall any more about that conversation?

"A. No.

. . . .

"Q. (By Mr. Moore) Miss Hobson, did you make the statement that date at that time that Jimmy and whoever were going to take him out to wherever and get rid of him?

"A. Yes, I did.

"Q. What were you talking about there?

"A. Pardon? What was I talked about?

"Q. What were you talking about?

"A. Well, I heard that something had to be done about Chris and meaning that Jimmy had to talk to him, but not in the sense of killing him.

"Q. Well, who said anything about killing him?

"A. The cops did.

"Q. Who did you hear talking about something had to be done about Chris?

"A. John Douglass and Steve Moore told me the morning that they came to my—our house.

"Q. You didn't hear your mom talking to Jim Crumm about that?

"A. No, all I said is, 'Something had to be done.'

"Q. Who said that?

"A. My mom and Jimmy.

"Q. All right. When was that?

"A. I guess that day, I don't know.

"Q. Suzanne, did you tell anybody about a conversation on April 17 in the parking lot at Jim's apartment?

"A. Yes, I did.

"Q. All right. And was that when you heard your mom and Jim talking about, 'Something had to be done about Chris'?

. . . .

"A. Yes.

"Q. (By Mr. Moore) Thank you, Suzanne. And did you say that you heard them talking and say that you heard them talking and say, 'She told Jimmy that something had to be done and he said, "We'll go out and get rid of him" '?

"A. I don't remember that. All I remember saying is that—them saying that something had to be done.

"Q. Would you like to refresh your recollection with State's Exhibit 15?

"A. Okay.

"Q. (Mr. Moore hands the exhibit to the witness.)

"A. Yeah, it says, 'He said, "We'll go out here and get rid of him." ' I don't remember saying that, but I don't ever remember hearing that.

"Q. Well, did you say that or did you not say that?

. . . .

"A. I don't remember.

"Q. (By Mr. Moore) You don't remember saying that?

"A. No, I don't.

"Q. Did you say, 'I don't know, they left for Burger King or something. She got him out of the house, she said that she's going to get Ed out of the house'?

"A. Right.

"Q. Where did you get that information?

"A. Huh? Well, I knew they were going to Burger King so Jimmy and Chris could talk.

"Q. Do you know why she wanted to get Ed out of the house?

"A. Yeah, so Jimmy and Chris could talk.

"Q. So Jimmy and Chris could talk. What were they going to talk about, Suzanne?

"A. What Chris had—the problems Chris had been causing.

"Q. And what kind of problems had Chris been causing that Jim was supposed to talk to him about?

"A. The rumors that he'd been spreading—that he did spread around about me.

"Q. Anything else?

"A. No—well, just the problems we had been having, stuff Chris had done.

. . . .

"Q. Did you say to Detective Douglass on May 4, 'Oh, she said that Jimmy went out and took care of him, so I wasn't sure'?

. . . .

"A. Yes.

"Q. (By Mr. Moore) Thank you Suzanne. Did you say to Detective Douglass on May 4, 'I didn't know what to think, I didn't know if they just beat him up real—just enough to put him in the hospital or not'?

"A. I don't remember that.

"Q. You don't remember that? Did you ever tell anybody that you figured what had happened to Chris?

"A. I don't know, I don t remember.

"Q. Suzanne, I'll hand you State's Exhibit 15 and ask you to refresh your recollection again, please.

"A.  Obviously I said that, but I don't remember.

"Q.  Did you ever say to Detective Douglass on May 4, 1980, 'I figured that he killed him'?

"A.  I don't remember.

"Q.  All right. Did you think or know that something was going to happen that night, Suzanne, April 17th?

"A.  I knew that Jimmy was coming over to talk to him.

"Q.  Did you hear any conversation between your mother and Jimmy about getting rid of Chris?

"A.  Getting rid of Chris, no, I don't remember.

"Q.  No, or you don't remember?

"A.  I don't remember.

"Q.  Did you hear any conversation between your mother and Jimmy about killing Chris?

"A.  No.

"Q.  No, or you don't remember?

"A.  No.

"Q.  Did you say to Detective Douglass on May 4 with regard to killing Chris, 'They didn't really say that word for word, they were just going to get rid of him that's all they said'?

"A.  Yes.

"Q.  You said that?

"A.  Right, but that didn't—to me they didn't say 'kill.'

"Q.  But I asked you a minute ago if they were going to get rid of Chris and you said you didn't remember that?

"A.  Right. But you said right then get rid of as in the meaning of killing.

"Q.  I don't want you to—

     "THE COURT: Excuse me, counsel, she's answered the question the way she could. You may proceed to the question.

"Q.  (By Mr. Moore) My question to you is, did you hear any conversation between Jimmy and your mother about getting rid of Chris?

"A.  No, I don't remember.

"Q.  Then my question is, did you say to Detective Douglass on May 4, 'They were just going to get rid of him'?

"A.  I could have, I don't remember.

"Q.  Did your mother tell you where you were to be on April 17, 1980 when Jim came to see Chris?

"A.  Yes.

"Q.  What did she tell you?

"A.  To be upstairs.

"Q.  For what purpose?

"A.  To take a shower.

"Q.  Why were you to be upstairs?

"A.  To soak my knee because I had been on crutches that week.

"Q.  Did your mom have any conversation with you about Chris' billfold?

"A.  No, I don't remember anything about the billfold.

"Q.  Did you make any statements to anybody about the billfold on May 4, 1980. Specifically John Douglass and Steve Moore?

"A.   I could have. Obviously I made the statement, yes, but I don't remember anything about the billfold. I didn't know anything about the billfold until they told me where it was.

"Q.   Did you tell John Douglass and Steve Moore on May 4 that your mom threw the billfold up at Metcalf South?

"A.   Yeah, I did, but—

"Q.   That's enough, thank you.

.   .   .   .

"Q.   (By Mr. Moore) Did you tell Detective Douglass on May 4 that your mother told you, 'She said that Jimmy went out and took care of him'?

"A.   I don't remember that.

"Q.   You're not saying you didn't say that?

"A.   No.

"Q.   Did you hear any conversation between your mother and Jim in the week or two weeks prior to April 17, 1980 about Jim getting a car or some money?

"A.   I knew he was going to get a car.

.   .   .   .

"Q.   Did you ever say to Detective Douglass on May 4 in response to his question, 'No, nobody really ever told me what was—I didn't even know anything about the money deal with Jimmy'?

.   .   .   .

"A.   Yes, I said that.

"Q.   (By Mr. Moore) Did you also say at that time, 'He just said that with the money he was going to get some kind of car'?

"A.   Yes.

"Q.   Do you know when your mom threw the billfold—Chris' billfold up at Metcalf South?

"A.   No, I don't remember.

"Q.   Are you saying, Suzanne, that the things you told Detective Douglass and Detective Moore are not true?

"A.   I don't remember, I don't remember anything—hardly anything about that conversation."